John A. GOLDSMITH, Plaintiff,

v.

E.I. du PONT de NEMOURS & COMPANY, INC., Defendant.

Civ. A. No. 81–275.

United States District Court, D. Delaware.

Aug. 26, 1983.

Bayard Marin, Marin & Hudson, Wilmington, Del., for plaintiff.

Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Jerry H. Brenner, Legal Dept., E.I. du Pont de Nemours & Company, Wilmington, Del., for defendant.

## OPINION

STAPLETON, District Judge:

Plaintiff, John A. Goldsmith, here charges his former employer, E.I. du Pont de Nemours & Co., Inc. ("du Pont") with unlawful employment discrimination. Goldsmith, who is black, alleges that du Pont retaliated against him for filing complaints with the Equal Employment Opportunity Commission ("the EEOC") and with the Office of Federal Contract Compliance Programs ("the OFCCP"). Such retaliation would concededly violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. The following constitutes

the Court's findings of fact and conclusions of law after a trial on the merits.

## I. FACTUAL BACKGROUND

Goldsmith was hired by du Pont in February, 1969, to work at its Wilmington Shops site. The Wilmington Shops is a machine shop specializing in high precision machinery and the fabrication of equipment for du Pont manufacturing plants. From March, 1970, until his discharge in September, 1980, Goldsmith worked in the assembly area of the manufacturing section of the Wilmington Shops. The work of that area primarily consisted of assembling various machines and pieces of equipment, and work related to the preparation of parts for assembling, including deburring, brush finishing, sand blasting, balancing, heat treating, cleaning and polishing.

The supervisory structure in the assembly area consisted of an area supervisor with overall responsibility for the group and two "first-line" supervisors who reported to the area supervisor. Goldsmith and the other area employees reported to the first-line supervisors. Goldsmith's work assignments on a day-to-day basis were given to him by his first-line supervisor. During most of the time of plaintiff's employment, Goldsmith's first-line supervisor was John Hrynyshen and his area supervisor was Roger Wood.[1] Approximately fifty employees worked in the assembly area under Roger Wood.

Throughout his employment, Goldsmith was unhappy with conduct of his employer which he viewed as discriminatory and, as a result, filed six different complaints with the EEOC between 1973 and 1980. These charges included unfair treatment of blacks in connection with job assignments, benefits, training, and promotion opportunities, as well as harassment and retaliation against him for the filing of charges. The EEOC investigated these charges and in each instance found no reasonable cause to believe that discrimination had occurred. The EEOC's determination with respect to

Goldsmith's February, 1975, complaint found, in part, as follows:

The records further show that between February 1, 1974 and February 1, 1975, forty-seven employees were promoted, five of whom were black (10.6%). In addition there were twenty-one employees promoted within the apprentice program; eleven were black. As 10.4% of Respondent's employees are black, the evidence shows no disparate impact with respect to Respondent's promotion policy. With respect to Charging Party's allegations concerning discipline, the records show that Charging Party was placed on a six month probation because of his unsatisfactory performance and attendance; Charging Party subsequently missed 33 days: the Probation was extended on February 21, 1975; Charging Party missed no time and the probation was lifted six months later. The evidence shows that Charging Party was disciplined for violation of Respondent's rules; there is no evidence that the rules are, in and of themselves, illegally discriminatory. Further, the records show that all persons, regardless of race, who were excessively absent were similarly disciplined.

Charging Party states that he has been harassed by being forced to do work which aggravates his physical condition; that all employees, black or white have been permitted to perform light duty if they have physical difficulties. Respondent contends and black co-workers confirm that Charging Party has been permitted to choose light duty assignments more than any other employee. In addition, although Charging Party stated that he was forced to remain on the job when he inhaled a chemical, he later conceded that he could have and should have used the substance outdoors as did other employees.

In view of the evidence outlined above, the Commission must conclude that Charging Party has not been denied pro-

---

1. Wood was at another du Pont site from January, 1975 until March, 1978, during which time Martin Wiph was the assembly area supervisor.

motions because of his race, that he has been disciplined in accordance with company rules which have been uniformly administered; that Charging Party has been given special consideration because of his physical conditions. Therefore, there is no reasonable cause to believe that Respondent has violated Title VII of the Civil Rights Act of 1964, as alleged.

In December, 1978, plaintiff filed a charge with the OFCCP complaining of a lack of promotional opportunities for women and blacks, lack of posting of the qualifications of jobs including supervisory positions, and lack of dissemination of the affirmative action plan. In addition, he complained of harassment against him for his filing discrimination complaints. This complaint prompted a large-scale investigation of the Wilmington Shops by the OFCCP.

An OFCCP investigator, Clifton Brooker, spent a total of several months at the site over a two-year period conducting a review. He first visited the site in August of 1979, when he was there almost every day. He returned on various days scattered throughout the next year, as well as for a lengthy period in July, 1980. Brooker's time was spent interviewing employees, talking to management and looking at files. Although at the conclusion of the review in June of 1981, and in a letter of July, 1982, the OFCCP notified du Pont that the Wilmington Shops affirmative action plan was not in compliance with federal regulations, in the OFCCP's final "Notification of Results of Investigation" issued in March, 1983, the OFCCP informed du Pont that

"there was insufficient evidence to conclude that the Contractor has violated its obligations under the nondiscrimination and affirmative action provisions under Executive Order 11246 as amended." (DX–11).

Throughout Goldsmith's employment with du Pont his overall performance can accurately be described as marginal. He received at least three annual reviews in which his performance was rated unsatisfactory, and problems with absenteeism [2] as well as low productivity while on the job led to his being placed on probation four times. Two of these probation periods were extended for six month periods. Goldsmith's first probation came in the early 1970's, prior to his having filed his first complaint.

Goldsmith's high rate of absenteeism was primarily attributable to a variety of health problems which plagued him during his tenure at du Pont and which increasingly became a source of difficulties between him and his employer. In particular, du Pont and Goldsmith developed a conflict over the proper role of du Pont in monitoring his medical condition. In January, 1980, Goldsmith was placed on probation as a result of these difficulties and in July, 1980, the probation was extended. He was finally discharged in September for actions the company viewed as a wilful violation of the terms of the probation.

## II. LIABILITY

As earlier noted, Goldsmith would predicate liability on a retaliation theory.[3] Du

---

**2.** Goldsmith missed the following amounts of time from work for illness and personal business:

| Year | Illness | Personal Business |
|------|---------|-------------------|
| 1969 | 60.0 hrs. | |
| 1970 | 289.6 hrs. | 33.5 hrs. |
| 1971 | 186.1 hrs. | 24.5 hrs. |
| 1972 | 160.4 hrs. | 67.3 hrs. |
| 1973 | 756.8 hrs. | 64.7 hrs. |
| 1974 | 550.8 hrs. | 10.0 hrs. |
| 1975 | 106.4 hrs. | 12.0 hrs. |
| 1976 | 396.6 hrs. | 66.9 hrs. |
| 1977 | 223.5 hrs. | 18.8 hrs. |
| 1978 | 119.2 hrs. | 30.5 hrs. |
| 1979 | 288.4 hrs. | 51.7 hrs. |
| 1980 | 293.7 hrs. | 31.2 hrs. |

**3.** In a previous opinion addressed to du Pont's collateral estoppel defense, plaintiff's case was described as being based on a dual theory, a theory that the acts complained of were motivated by plaintiff's race and/or by a desire to retaliate. It is apparent from a reading of the complaint, the Pretrial Order and the argument section of plaintiff's post trial brief, however, that his case is based solely on allegations that du Pont treated him differently from others because of his complaints to government agencies. None of these documents, for example, rely upon 42 U.S.C. § 2000e–2. I note this fact because plaintiff's trial testimony included complaints about du Pont's failure to provide its employees with information about the manner of progressing from the Service Operators

Pont's alleged retaliatory actions against Goldsmith took several forms: first, abusive working conditions, including physical harassment, excessive monitoring and his assignment to menial job tasks; second, the "hindering" of plaintiff in the pursuit of promotional opportunities; third, discriminatory application of the company's disability wage plan; and fourth, his placement on probation and later discharge. (Pretrial Order pp. 1–2, 8–9).

 Goldsmith has the burden of persuasion to show that he engaged in protected activity, that he was thereafter subjected by his employer to adverse employment action, and that a causal link exists between the two. *See, Ferguson v. E.I. du Pont de Nemours & Co., Inc.,* 560 F.Supp. 1172, 1200 (D.Del.1983), *citing Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir.1982.)[4] A causal link is established by a showing that the protected activity was the likely reason for the adverse action. *Id.*[5]

 Preliminarily, it is clear that a causal link can only exist, as du Pont points out, if the employer in fact was cognizant at the time of the employment action that its employee had engaged in protected activity. *See Ferguson,* 560 F.Supp. at 1200. Du Pont suggests that there has been no such showing here with respect to the OFCCP investigation. The evidence is abundantly clear, however, that even if du Pont's supervisory personnel were not *certain* Goldsmith had filed charges with the OFCCP, they certainly suspected it. Goldsmith's action in filing numerous prior complaints of discrimination was well known and he was the only employee at the Wilmington Shops to have filed such charges. Paul Nagy, superintendent of manufacturing and engineering, admitted he suspected from the very beginning of the investigation that Goldsmith was responsible. I have no reason to believe other veteran supervisory personnel were any less astute. As hereinafter noted, however, I do accept the testimony of John McCarley that he did not know of any of Goldsmith's filings when he made the decision to place him on probation in January of 1980. McCarley had arrived at the Wilmington Shops only a few days before this decision was made.

### A. Abusive Working Conditions

It is apparent that the lengthy OFCCP investigation engendered a certain amount of irritation on the part of the Wilmington Shop's management. The investigation, unlike the earlier EEOC investigations, was highly intrusive and disruptive of normal work activities. Nagy testified, for example, that when Brooker, the OFCCP investigator, was at the site, Brooker occupied almost all the time of the entire employee relations group. He also disrupted the work of the assembly area because of his many interviews with the assembly area employees. In addition, Brooker's apparent outspokeness in his criticism of many of du Pont's employment practices was not viewed favorably by the management at the Wilmington Shops. In short, Brooker's presence was, as the present manager of the Wilmington Shops, John McCarley, Jr.,

Group to the Assembly Craftsman Group and about the criteria for promotion to first-line supervisor. These alleged employment practices did not apply only to Goldsmith and, obviously, were not intended as retaliation against him. If these complaints had been issues in the case, the record would not sustain a finding that these practices had a disparate impact on blacks or that they reflect deliberate discrimination against Goldsmith.

4. The analysis is the same under both Title VII and Section 1981. *See Scott v. Univ. of Del.,* 455 F.Supp. 1102, 1120 (D.Del.1978), *citing McDonald v. Sante Fe Trail Transp. Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

5. It is not necessary, having completed trial, to frame the issues in terms of (1) prima facie case; (2) the burden on defendant to offer a nondiscriminatory reason; and (3) plaintiff's burden to show that the nondiscriminatory reason is merely a pretext. *United States Postal Service Board of Governors v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). *See Davis v. Carolina Freight,* C.A. No. 79–456, Memorandum Opinion at 15 (D.Del., June 30, 1983). The only issue is the ultimate one of whether the defendant intentionally retaliated against the plaintiff. *Id.*

candidly admitted, "very much" an annoyance.

### 1. Retaliatory Harassment

■ I am convinced that in the case of one individual, Roger Wood, this antagonism went beyond mere feelings of annoyance and was translated into retaliation against Goldsmith. Goldsmith was in Wood's group and his actions must necessarily have involved Wood most directly and personally. This undoubtedly fueled greater irritation on Wood's part. Further, Wood's reaction appears to have been qualitatively different than others; he was not simply annoyed that a disruption was taking place, but was "annoyed that they were spending federal funds the way they were." (Tr. G–19). I believe this statement reflects an attitude of deep resentment on the part of Wood towards Goldsmith for filing charges he viewed as unfounded and unimportant.

It is apparent that there had been a longstanding personality conflict between Wood and Goldsmith. Wood was a "no nonsense type of supervisor" who, I believe, was quite impatient with Goldsmith's absenteeism, low productivity, and claimed physical disabilities. This impatience had manifested itself upon occasion even before the OFCCP investigation.[6] I believe Goldsmith's testimony, however, that this investigation exacerbated Wood's dislike for him and ultimately led to increased harassment of Goldsmith which would not otherwise have occurred.

Plaintiff, as a result of an automobile accident in 1973, had a peculiar physical sensitivity to being touched. Everyone in the Shops was aware of this sensitivity including Wood. Wood nevertheless deliberately touched Goldsmith on a few occasions and often stood immediately behind him as though he were going to touch him. One particularly acute episode of such harassment occurred on January 15, 1980, when Wood, during a two or three hour period, repeatedly stood next to plaintiff and attempted to squeeze behind him at his work table. This continued even after Goldsmith spoke to Wood about it and after he took the piece of equipment he was working on to a table on the other side of the room. Goldsmith found Wood's activity so harassing he went to the company's nurse at 11:00 a.m. in an extreme state of agitation to ask to have the rest of the day off. His agitation was obvious to the nurse who called Roger Wood to find out what had happened. Wood claimed to have no knowledge of any incident as he said he was tied up in two meetings all morning.

Goldsmith's version of what happened is more believable. Wood's version was *not* that there had been some encounter with plaintiff, albeit an innocent one, which could perhaps have been misconstrued, but rather that there was no involvement whatsoever between the two of them that morning. I do not think it plausible Goldsmith would have been aroused to the extremely agitated condition to which the nurse testified, absent some encounter with Wood. Accordingly, I conclude Wood did deliberately harass Goldsmith that day. As earlier indicated, I believe that this was not an isolated instance,[7] that similar episodes occurred between the Fall of 1979 and September of 1980, and that Wood's conduct was motivated in substantial part during this period by his resentment of the OFCCP investigation occasioned by Goldsmith's complaint.

### 2. Retaliatory Monitoring

■ Goldsmith also contends that he was harassed by excessive monitoring of his work. He complains, in particular, of being required periodically to "count pieces" of completed work, a task which interrupted

---

**6.** Goldsmith maintains that this earlier activity of Woods was in retaliation for earlier complaints filed with the EEOC. I am not persuaded, however, that these earlier complaints had any causal connection with conduct of which Goldsmith complains. Moreover, recovery for any retaliatory conduct prior to June 25, 1978, is barred by limitations.

**7.** Wood's harassment of Goldsmith on a continuing basis was confirmed by two other witnesses from the assembly area.

his work. I believe that Goldsmith's work was closely monitored by Hrynyshen, that he was required to "count pieces" from time to time, and that Goldsmith perceived this as being in retaliation for protected conduct. I am not persuaded, however, that Hrynyshen did anything other than his job as a first-line supervisor.

As discussed more fully hereinafter, Goldsmith had a continuing productivity problem which could be expected to draw supervisory attention and no one from the Shops other than Goldsmith testified that the supervision of his work was more intense than others similarly situated. Moreover, while there was some friction between the two, the evidence does not suggest to me that Hrynyshen harbored the same resentment of Goldsmith and of the OFCCP investigation as Wood.

### 3. *Retaliatory Work Assignments*

■ Goldsmith alleges that prior to April 28, 1978, he had been assigned to assembly work, which he viewed as "technical" and challenging, 65% of the time and to "menial" jobs only 35% of the time. After that date he alleges that 90% of his assignments were "menial." In his testimony, Goldsmith attributed this abrupt change to the receipt by du Pont of an EEOC "no reasonable cause determination" on that date, terminating the investigation initiated by his complaint of June, 1977.

It is relatively clear from the record that during the period from May, 1978 until his discharge, Goldsmith did primarily balancing and deburring work which he considered menial, and did only a small amount of "light assembly" work. The debateable issue is whether that assignment pattern was attributable to retaliation for protective activity. A subordinate, yet important, issue is whether the same pattern existed prior to May of 1978.

I conclude that Goldsmith's dissatisfaction with job assignments considered by him to be menial is a longer standing problem than he now suggests. He testified, for example, that he filed a complaint with the NLRB in late 1972 or early 1973, alleging

that he had been discriminated against through assignment to menial jobs, by which he meant "deburring or that type of work." (A–28–29). He wanted exposure to more complicated assembly work because he correctly perceived that this was the route to advancement. During Charles Tinsley's tenure as plant manager (1970 to 1980), Goldsmith filed a number of grievances about being assigned to menial work, grievances which led to a review of his work assignment by the top site management. Finally, Goldsmith complained to the EEOC in 1979, and continues to complain, that his inability to perform assembly work better than he can is attributable to the failure of management to give him experience with that sort of work. *See* EEOC complaint of 7/27/79, PX 1. If he had, in fact, been spending 65% of his time prior to May of 1978, doing assembly work, I think it unlikely that this inexperience problem would still exist.

Accordingly, I conclude that there was no abrupt change in Goldsmith's assignment pattern in April of 1978 and that Goldsmith has never done predominantly assembly work. For this reason, I cannot adopt Goldsmith's specific theory regarding retaliation. In addition, however, Goldsmith argues, more generally, that the failure to give him more assembly work throughout his career is attributable to his protected activity. The fact that the assignment to menial jobs antedates his first complaint is, of course, inconsistent with this more general theory. But, more importantly, I believe there are other, more likely, explanations for the failure to assign more assembly work to Goldsmith. Goldsmith's absenteeism and productivity problems date back to the early 1970's and I believe his image in the eyes of his immediate supervisors was not such as to make him stand out as a candidate for a more responsible position. Then, when an effort was made following his grievances to give him more opportunity to do assembly work, he mastered some of his new assignments but not others and his productivity was below normal.

B. *Retaliatory "hindering" of Plaintiff In his Pursuit of Promotional Opportunities*

■ In mid-1978, the Superintendent of the Employee Relations Section took early retirement. The person holding that position was responsible for all activities of that section, including negotiations with the union, pay determinations, and the administration of the employee benefit plans. When this vacancy occurred, management reviewed the roster of site employees and found no one with the requisite experience. Ultimately someone was brought in by transfer from another site. The individual selected, James Hamilton, had twenty-five years of experience with du Pont in employee relations, twenty of which had been spent at the Employee Relations Superintendent level.

On October 9, 1978, while the superintendent's position remained opened, Goldsmith expressed interest to Hrynyshen and asked what the qualifications for the position were. Goldsmith testified that Hrynyshen said he did not know the qualifications but, whatever they were, Goldsmith did not meet them. While Hrynyshen does not now recall this conversation, I believe that an interchange of this character in fact occurred.

In order to appreciate the impact of Hrynyshen's response on Goldsmith, one must know that he had attended night school at Goldey Beacom College and Delaware Technical and Community College, and, by 1976, had received associate degrees in business administration and accounting. In addition, Goldsmith had taken several courses in the employee relations area at the University of Delaware. Based on this training, Goldsmith aspired to a career in personnel relations. He is an intelligent and articulate individual and this was not an unreasonable aspiration. It was not reasonable, however, for Goldsmith to expect that someone with no employment experience in employee relations would be seriously considered as a candidate for the position of Employee Relations Superintendent, and the fact that Hrynyshen may have so advised Goldsmith, even if not in the most sensitive manner, does not suggest to me that Hrynyshen was hindering Goldsmith's promotional opportunities in retaliation for his protected activity.

There is a more substantial conflict of testimony about a later meeting between Goldsmith and Hrynyshen. In the Fall of 1979, management developed job criteria for various jobs on the site as well as a series of validated tests designed to identify employees who would be likely to succeed in supervisory positions. Any employee interested in taking a test was advised to indicate that interest to his or her first-line supervisor. Goldsmith arranged to meet with Hrynyshen on December 11, 1979, and both sides agree that a meeting took place. Goldsmith maintains that he was told that he could not take the test and that he was not qualified for any supervisory position. Hrynyshen, on the other hand, testified that he expected a request to take the test for supervisors in Machining, a request which management had already decided to grant, but that Goldsmith inquired only about the criteria for positions in cost control, accounting, and manufacturing/engineering and, to Hrynyshen's surprise, did not ask to take any exam.

I do not believe that management would have refused any request of Goldsmith's to take a test during the pendency of the OFCCP investigation and while they were under Brooker's careful scrutiny. Nor do I believe that, in this context, Hrynyshen would tell Goldsmith, as Goldsmith claimed, that he had to be able to operate a jig borer machine in order to be a first-line supervisor in Machining. I think it more likely that Goldsmith inquired about supervisory jobs in other departments, and that he received what he perceived as a negative response from Hrynyshen, and that, as a result, Goldsmith wound up not asking Hrynyshen to nominate him for the test. Hrynyshen's image of Goldsmith was of a services operator in a machine shop and a not very successful one at that. That undoubtedly colored his response to Goldsmith's inquiry about supervisory positions in other

departments and he may perhaps be faulted for not perceiving Goldsmith's potential. I do not believe that his conduct can be attributed to retaliation for protected activity, however.

## C. Retaliatory Application of the Disability Wage Plan

█ Du Pont has a disability wage plan under which employees can receive their regular wages during absences caused by illness or injury. Plaintiff maintains he was retaliated against in the treatment he received under this plan.

Although the terms of the plan provide that satisfactory evidence of inability to work must be provided in order to be paid, the general practice at the Wilmington Shops was to require such verification only after three or more days of absence. Nevertheless, on one occasion in June of 1979, Goldsmith was required to produce written verification from his physician after an absence of only two days. I do not conclude that this is evidence of retaliation, however. Du Pont pointed out that there have been several occasions when other employees were required to produce verification after a one or two day absence. Even if those individuals, unlike Goldsmith, were on probation at the time as he suggests, given Goldsmith's history of absence due to numerous health problems, it was reasonable for du Pont to adhere to the literal terms of the plan requiring verification of illness.

I also find there was no retaliation in the treatment given Goldsmith with respect to the other incident to which he points. During July of 1979, Goldsmith advised du Pont that he had been told by his family physician to stay home for 12 days due to "acute anxiety and stress." Du Pont requested that Goldsmith be examined by a company physician, a condition which was within the terms of the disability wage plan. The company's physician who saw Goldsmith, Dr. Tedesco, determined that Goldsmith was able to do light duty work. Although Tedesco requested permission to contact plaintiff's personal physician. Goldsmith

refused to grant it. When Goldsmith refused to return to work despite Tedesco's determination, du Pont refused to pay him for the remainder of his absence.

Goldsmith was not the only individual to have been required to see a company physician as a prerequisite to receiving disability pay and, particularly in light of the nature of his medical problems, I do not believe the company's actions in requiring such a visit were retaliatory. Further, given the recommendation of its physician, I also find there was no improper motivation in the company's refusal to pay Goldsmith during the remainder of his absence.

## D. Retaliatory Placement on Probation and Discharge

█ Du Pont placed Goldsmith on probation on January 28, 1980, following various events which transpired after plaintiff's difficulties with Wood on January 15, 1980. As noted above, plaintiff went to the company's nurse on that day as a result of certain harassment by Wood. He was extremely agitated and upset and he stated to the nurse that he did not want to go to jail for hurting Wood. Goldsmith requested that he be allowed to go home on personal business without pay in order to discuss his problems with a personal friend who was a priest. The nurse asked Wood about Goldsmith's request, but Wood said if Goldsmith was so "emotionally unstable" as to be unable to do his job, then he should go home on disability rather than on personal business. Since the employee relations superintendent, James Hamilton, was unavailable, the nurse followed Wood's instructions and sent Goldsmith home on disability.

The next day, Wednesday, January 16, Goldsmith met with Hamilton, Wood and two union representatives to discuss the events of the day before. At that meeting, Hamilton asked Goldsmith whether he had made remarks about Wood that might be construed as a threat towards Wood. Goldsmith declined to explain his remarks, and told Hamilton he could take the remarks any way he wanted to.

Goldsmith was then directed by Hamilton to visit a du Pont physician at du Pont's Louviers Building. Goldsmith complied with this directive but refused to give Dr. Tedesco any information other than his name and payroll number and, for that reason, received no examination or evaluation. Goldsmith returned to Wilmington Shops but then went home and stayed home until the following Monday.

Another meeting was held on Monday, January 21. Hamilton insisted that, before Goldsmith would be allowed to return to work, he must visit and cooperate with medical personnel of du Pont so that an informed judgment could be made about his fitness for work. Goldsmith refused to report to the medical department, however, unless he could take his doctor, lawyer, or priest. Du Pont viewed that request as unreasonable and sent Goldsmith home.

After receiving a letter from du Pont advising him of an appointment, Goldsmith did report to Tedesco on January 28. Tedesco advised Goldsmith it would be necessary for Goldsmith to agree to see a psychiatrist before Tedesco would let him return to work. Goldsmith agreed and an appointment was made for him on January 30th with a psychiatrist in private practice. Tedesco reported this to Hamilton.

Upon returning to the Wilmington Shops on January 28 from his visit with Tedesco, Goldsmith was informed of the company's decision to place him on six months' probation. The specific reasons given for probation were his failure to cooperate with the du Pont medical staff, including his failure to communicate with Dr. Tedesco on January 16, and his refusal to go unaccompanied to see Tedesco on January 21, and his "alluding to a threat of bodily harm" against Wood. (Tr. C–32). It was also noted that his refusal to cooperate in obtaining an assessment of his fitness to work had resulted in absence from work and had added to his poor attendance record. The terms of his probation were compliance with all reasonable work related requests and a sincere effort to improve attendance. When Goldsmith failed to keep the appointment

with the psychiatrist on January 30th, an addendum was then made to the probation requiring as an additional probation term that Goldsmith see a psychiatrist. Goldsmith saw a psychiatrist on January 31, 1980, who approved his returning to work and reported to Tedesco that he would be working with Goldsmith on a regular basis.

The decision to place Goldsmith on probation was made by John McCarley, the manager of the Wilmington Shops. McCarley, who was new to Wilmington Shops, having started as manager on January 14, 1980, consulted with his staff about the decision. Although there were recommendations to discharge Goldsmith, McCarley agreed with Hamilton's recommendation of probation. McCarley felt that Goldsmith needed medical treatment or help and that, given such treatment, Goldsmith could still be a productive employee.

On July 28, 1980, plaintiff's probation was extended for another six months. McCarley, apparently upon the recommendations of Hamilton and Wood, made the decision to extend the probation because of Goldsmith's poor attendance during the probationary period and because of what McCarley perceived as a failure to cooperate on two occasions with the medical group. During the first six months of probation, plaintiff had been absent 34 full days and parts of 11 other days. Included in this was one prolonged absence of 25 days, from February 25 to April 1, when he was hospitalized for arthritis, pulmonary fibrosis, and emphysema. The terms of the extended probation required that overall attendance improve, that disability absences be supported by a physician's statement satisfactory to the Company, and that Goldsmith comply with all reasonable work related requests, including visits to the Company medical department at Louviers.

In September, 1980, the events leading to Goldsmith's discharge occurred. On September 5, Goldsmith reported to the nurse at the Wilmington Shops complaining of pain in his eye, a swollen finger, and his knee. He asked to go home on personal business without pay, and was told to see

Hamilton. Hamilton advised him that he would not be authorized to leave on personal business or on disability unless he was first examined by the du Pont medical staff.

Goldsmith returned to his work and shortly thereafter, called his own physician and made an appointment. Goldsmith then reluctantly went to the medical department, informing Tedesco that he was there at Hamilton's insistence and that he wanted to see his personal physician. Tedesco asked Goldsmith if he could examine him but Goldsmith refused to consent. Without an examination, Dr. Tedesco would not authorize him to leave work. Plaintiff returned to the Shops and Wood sent him home.

After reviewing the events, McCarley concluded that Goldsmith, by refusing an examination, had wilfully violated . the terms of his probation and should therefore be discharged. On September 10, 1980, in a meeting with Hamilton, Goldsmith was informed that he was being discharged for not cooperating with company medical personnel.

Goldsmith sees his placement on probation, the extension of that probation, and his ultimate discharge as parts of an overall conspiracy of management to get rid of someone who was causing trouble by filing complaints with government agencies. I conclude that he is mistaken. It is true that the events which led to Goldsmith's being placed on probation in January of 1980 were precipitated by Wood's retaliatory harassment but this is the sole connection between retaliatory conduct and the

discharge and does not render that discharge unlawful.[8]

Du Pont, as an employer, has a right to insist upon sufficient information to evaluate an employee's fitness for work, particularly, one with an absentee record like that of Goldsmith. Moreover, when an employee shows signs of possible emotional instability as Goldsmith did on January 15th and had earlier done on several occasions, an employer owes it to the other employees to monitor the situation. Du Pont attempted to do that in January of 1980, but its efforts were frustrated by Goldsmith's failure to cooperate. That failure was not justified by the fact that Wood's retaliatory conduct contributed to the problems Goldsmith was experiencing at work.

Likewise, I conclude that the extension of probation was not retaliatory, but rather a continuing effort to deal constructively with an employee having a serious attendance problem. Goldsmith's many absences during the first six months of probation were attributable to bona fide illness and, accordingly, did not warrant discharge. They did, however, indicate that his attendance problem was on-going.

Finally, I conclude that retaliation played no role in Goldsmith's discharge on September 10th.[9] Goldsmith simply placed McCarley in a position where he had no choice.[10] Goldsmith had been placed on probation on the express condition that he cooperate sufficiently to permit his fitness for work to be evaluated. He had been told that a failure to cooperate would mean discharge. Goldsmith nevertheless deliberately refused to permit the medical group to examine him. This decision was the sole cause of his discharge.[11]

---

**8.** It is apparent from the record relating to Goldsmith's absentee record and his attitude toward du Pont's medical staff that the problems which led to Goldsmith's probation and subsequent discharge would have developed even without Wood's unlawful conduct.

**9.** As I have previously held, Goldsmith is collaterally estopped from contending that he did not wilfully violate the conditions of his probation or that his wilful violation did not motivate the discharge. I assume, without deciding, that this does not foreclose a contention that retalia-

tion nevertheless played some role in the discharge.

**10.** If Goldsmith's conduct had presented a debateable issue, I believe McCarley would have been extremely reluctant to discharge him with the OFCCP investigation in progress.

**11.** Given the continuation of Wood's harassment through the summer of 1980 and the fact that Goldsmith's deliberate refusal to be examined was tantamount to a resignation, I have considered whether Goldsmith might be entitled to relief on a constructive discharge theo-

## III. DAMAGES

 Because of the above findings, Goldsmith is entitled to relief on his claim of retaliatory harassment.[12] The only competent evidence in the record about when du Pont learned of the OFCCP investigation is a letter from the agency dated July 31, 1979. The investigation commenced in August and it is fair to infer that the harassment by Wood attributable to retaliation commenced in early fall of 1979. Goldsmith expressly testified that it was still continuing at the end of May 1980, and I think it more likely than not that Wood's resentment of the investigation affected his conduct towards Goldsmith through the summer.

Direct supervision of employees was only a minor part of Wood's considerable responsibilities and I do not believe that the harassment of which Goldsmith complains was a daily occurrence. On the other hand, I am persuaded that it was not infrequent. Moreover, given Goldsmith's personality and viewpoint, I think it clear that the emotional distress caused by Wood's conduct was substantial. Finally, I am confident that this emotional distress did not cease with the termination of the contact between Wood and Goldsmith and, indeed, lingers today.

Based upon the foregoing, I conclude that damages should be awarded to Goldsmith in the amount of $10,000. Given my findings with respect to Goldsmith's other claims, however, this will be the only relief afforded.

ry. It is clear, however, that Goldsmith's refusal to be examined had nothing to do with Wood's harassment. Moreover, Wood's conduct did not create an environment so intolerable that a reasonable person in Goldsmith's position would have been moved to resign because of it. *See Ferguson v. E.I. du Pont de Nemours and Co., Inc.,* 560 F.Supp. 1172, 1203 (D.Del.1983).

12. Du Pont urges that harassment must be so prevalent and pervasive as to constitute a "condition of employment" in order to provide a basis for recovery under the Civil Rights Acts. The cases it cites, however, deal with whether

an employer has created a "hostile environment" which "discriminates with respect to ... compensation, *terms, conditions,* or privileges of employment" in violation of 42 U.S.C. § 2000e–2(a). (Emphasis added). The issue here is whether an employer "discriminate[d] against any individual ... because he has opposed any practice made unlawful by" Title VII. 42 U.S.C. § 2000e–3(a). Harassment in retaliation for protected activity violates this section. Larson, *Employment Discrimination,* Vol. 3, 17–27 (1983). EEOC Decision 70–661, 2 F.E.P. 587 (1970).