765 A.2d 217 (2001)
336 N.J. Super. 395
William SHEPHERD and Richard Saylor, Plaintiffs-Appellants,
v.
HUNTERDON DEVELOPMENTAL CENTER, William Wall, Superintendent, Leon Cronce, Assistant Superintendent, Arthur Searfass, Assistant Supervisor of Professional Residential Services, Mario Sclama, Cottage Training Supervisor, and Ida Gal, Cottage Training Supervisor, Defendants-Respondents, and
Vincent Murante, Cottage Training Supervisor, and Donald Stambaugh, Cottage Training Supervisor, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 2000.
Decided January 18, 2001.
*222 James L. Pfeiffer, Phillipsburg, argued the cause for appellants (Pfeiffer & Winegar, attorneys; Mr. Pfeiffer, of counsel; Brian A. Roemersma, on the brief).
Barbara Berreski, Deputy Attorney General, argued the cause for respondents Hunterdon Developmental Center, William Wall, Leon Cronce and Arthur Searfass (John J. Farmer, Jr., Attorney General, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Ms. Berreski, on the brief).
Cynthia M. Jacob, Somerset, argued the cause for respondents Mario Sclama and Ida Gal (Collier, Jacob & Mills, attorneys; Ms. Jacob, of counsel; John P. Barry, on the brief).
Before Judges HAVEY, WEFING and LEFELT. *218 *219 *220
*221 The opinion of the court was delivered by LEFELT, J.A.D.
Plaintiffs William Shepherd and Richard Saylor sued their employer, defendant Hunterdon Developmental Center ("HDC"), and several supervisory and management employees for creating a hostile work environment, retaliation, negligent supervision and conspiracy in violation of New Jersey's Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 through -49. Shepherd and Saylor asserted that defendants treated them unfairly because they had assisted two other employees in a successful racial discrimination lawsuit against HDC. Plaintiffs appeal from the trial judge's summary judgment dismissing their entire complaint. The judge ruled that Shepherd's complaint was timely only as to the events that occurred on one specific date and that those events were insufficient to create a cause of action for hostile work environment or retaliation. We affirm some of the dismissed claims in favor of several of the defendants, but reverse and remand because plaintiffs' allegations, read in the light most favorable to them, support the theory that defendants' violations were continuing ones, rendering their complaint timely. In addition, disputed questions of material fact existed regarding plaintiffs' hostile work environment claim and Saylor's retaliation claim against HDC and two supervisors, precluding summary judgment.

I.
HDC is a State-operated facility providing long-term care services for physically and mentally handicapped clients. It consists of several cottages, including Cottage # 22 where the plaintiffs worked as staff. Each cottage is divided into eight dorms, with four clients rooming together in each dorm. Cottage # 22, thus, had a total of thirty-two clients. All were severely retarded males, some assaultive or self-abusive, ranging in age from twenty to sixty-five years old.
Both plaintiffs Shepherd and Saylor were cottage training technicians in Cottage # 22, working the 11 p.m. to 7 a.m. shift with one or two other cottage training technicians. Each cottage training technician was responsible for two to three dorms. Cottage training technicians attend to the clients' needs, fold laundry, *223 perform bed checks every thirty minutes and make sure each dorm is clean. With the exception of an eight-month period, Shepherd worked at Cottage # 22 continuously from October 1983 until March 1995. Saylor remained in Cottage # 22 from December 1984 until his retirement in August 1995, at the age of sixty-five.
In 1989, racial problems surfaced in Cottage # 22. Two African-American employees on plaintiffs' shift, Annie Sampson and Donald Greenfield, sued HDC and their direct supervisors, Mario Sclama and Ida Gal, for discriminating against them and creating a hostile work environment. Sclama and Gal were also plaintiffs' supervisors.
Shepherd and Saylor supported Sampson and Greenfield in the litigation. From 1989 to 1990, they verbally expressed their displeasure about racial discrimination in the cottage, not only to Sclama and Gal, but also to HDC's assistant supervisor of professional residential services and the assistant superintendent. Shepherd wrote an October 18, 1990 statement on behalf of Greenfield. Both Shepherd and Saylor wrote October 12, 1990 statements supporting Sampson. Saylor claimed that he wrote about three to four memos in the early 1990's concerning racial harassment in the cottage. During this period, management at HDC considered Shepherd, Saylor, Sampson and Greenfield all to be "troublemakers."
The hostile environment continued until Sampson and Greenfield were forced to leave the cottage. Things remained relatively quiet until the late summer and early fall of 1994, when the lawsuit came to trial. The lawsuit was tried from October 24 through December 19, 1994 and was won by Sampson and Greenfield. The jury awarded Sampson compensatory damages of $675,000, Greenfield compensatory damages of $335,000, and punitive damages to each in the amount of $252,000.
Beginning in November 1994, when Sclama and Gal had to appear in court for the Sampson and Greenfield law suit, they began to take out their frustrations on Shepherd and Saylor, who were the only two workers left in Cottage # 22 who had been there when the earlier racial problems had occurred. Shepherd claimed that Gal said to him, "We're being sued and you and Mr. Saylor are to blame for it." Shepherd was also told that his name had been mentioned at the trial and that "they" were quite upset about it. Plaintiffs also believed that the statements they had previously given regarding the racial problems in Cottage # 22 were introduced against the defendants at the trial. Gal also said, on more than one occasion during the law suit, that "what goes around comes around" and that plaintiffs would be "sorry" for not backing the agency and agreeing with her side in the suit. Gal told Shepherd that both she and Sclama would be watching and writing down everything that he and Saylor did. Gal also told Saylor that she was a "survivor" and that she would do whatever she had to in order to survive. Both Shepherd and Saylor understood the comments that were made during the pendency of the trial to mean that they would be harassed as Gal and Sclama intended to get even with them.
From the time of the trial forward, Shepherd and Saylor noticed that Sclama and Gal began to supervise them much more aggressively. Sclama focused on plaintiffs' work "in a very technical sense." Though Sclama had always been a stickler for details, he began criticizing all the little things plaintiffs did that they had been doing the same way for the past twelve years. He spoke to plaintiffs in a hostile, unfriendly, and sharp tone. Sclama never said hello to them anymore and did not engage them in any conversation that was not work-related. While in the past, they had shared meals together or spoken about baseball, Sclama no longer participated and always looked and acted as if he were angry at them.
*224 At Christmas time in 1994, Sclama gave gifts to all the other employees on their shift except for plaintiffs. One time, another worker was allowed to take an extra half-hour break because there was no coffee, but Shepherd was not given the same option. When Shepherd called out sick around Christmas and New Year's, he was put on "medical verification," meaning the management felt he had abused his sick time. After a union grievance hearing on February 3, 1995, Shepherd was immediately removed from medical verification.
One evening in January 1995, Shepherd reported to Gal that a client needed to be medicated. Gal made Shepherd wait three hours before he received the medication. This delay caused Shepherd to have to deal with a very unruly client. In the ordinary situation, a supervisor called for medication immediately or otherwise assisted with the client. In another instance, in early February, Sclama ordered Shepherd to shower a client who had urinated in bed. Previously, the standard operating procedure for this client was to provide dry pajamas and a dry bed and put him back to sleep, without a shower. Because the client was showered in the middle of the night, he became violent, self-abusive and destructive in his dorm room. Shepherd believed that Sclama purposely created this situation to get back at him and make him upset.
On February 10, 1995, after the trial had concluded, another employee in the cottage laughed to Gal and Sclama, in a loud voice, that a newspaper article reported that the State was appealing the verdict and that Sampson and Greenfield would not be getting their money yet. Shepherd believed that defendants had told the employee to make this comment in front of him. Another worker told Shepherd that he had heard from certain supervisors that the superintendent was "mad as hell" and that people were being transferred who had written statements not agreeing with their supervisors. This worker also told Shepherd that it was not too late for him and Saylor to say they were wrong about what happened. Again, Shepherd believed that defendants were behind this conversation. Shepherd also heard Sclama say that people might have to go to jail; Shepherd took that as a veiled threat against him and Saylor.
On April 19, 1995, the assistant supervisor of residential services sent Saylor a "letter of caution" concerning "patterned absences" that Saylor believed was retaliatory. Also, Saylor understood that an employee could be dismissed for having three charges of the same offense sustained against him. Saylor believed that following the lawsuit Sclama was setting him up to be disciplined. In fact, Sclama had written him up twice for coming back late from a break. The cottage training supervisor also charged Saylor with using inappropriate language; on March 3, 1995 Sclama charged Saylor with using the "F" word in front of clients; and on April 5, 1999, Sclama brought disciplinary charges against Saylor for using a certain slang word to refer to a group of people back on January 20, 1995. Saylor was suspended for three days as a result of the first incident; the second incident did not result in any actual discipline against Saylor because he denied the allegation; and the agency could not prove its case against him with respect to the third incident. Saylor feared that Sclama would obtain three discipline convictions against him so he would be terminated before he earned the ten years of service he needed for retirement.
During the trial, both plaintiffs initially refused to put anything in writing to HDC management regarding their complaints because they were afraid of being transferred out of the cottage. However, at the urging of the affirmative action officer, on February 1, 1995, both plaintiffs wrote handwritten letters to HDC's superintendent. They told the superintendent about the retaliation and harassment in Cottage # 22 which had started "all over again" and "worse than ever." They identified *225 specific incidents which occurred and named Sclama and Gal as the culprits. Both men identified the emotional stress that this behavior was causing them, and Shepherd in particular noted his desire to remain in Cottage # 22, where he had been for twelve years with mostly the same clients, all of whom knew and liked him.
In response to these letters, the superintendent called a shift meeting on February 9, 1995 and scheduled counseling sessions for the shift on March 15, 1995. Plaintiffs claimed that the shift meeting was ineffective, and due to late notice, they were unable to attend the counseling sessions.
Plaintiffs filed complaints with the agency's affirmative action officer. According to the form filed by Shepherd on March 2, 1995, he identified specific dates on which the alleged retaliatory harassment had occurred. The first date was November 30, 1994, and the last was February 27, 1995, or three days before his affirmative action complaint was filed.
During the last week of February or early March 1995, Shepherd requested a transfer to Cottage # 7. When Gal found out about his request, she remarked, "[w]e were going to get rid of you anyway." Shepherd began working in the new cottage on March 18, 1995. While the transfer was initially stressful because he had to learn the behaviors and needs of all new clients, Shepherd admitted that he was much happier in his new assignment and that his performance ratings had improved. In fact, his new supervisor referred to him as an "asset."
Saylor filed for retirement on March 17, 1995, and his last work day was in July 1995, with his retirement beginning in August 1995. He claimed that he retired earlier than he otherwise would have because of the harassing behavior of his employer and supervisors.
On December 22, 1995, both plaintiffs received responses to their affirmative action complaints, in which the Department of Human Services concluded that there was no reprisal against them for their participation in the prior lawsuit and that there was no probable cause to support their charges. On January 12, 1996, both plaintiffs appealed that ruling to the Department of Personnel. As of March 22, 1999, the Department had not yet ruled on the appeal.
In the meantime, in May 1995, plaintiffs had filed complaints with the Equal Employment Opportunity Commission ("EEOC"). On Shepherd's application he listed the dates of harm as November 1994 to March 1995 and claimed that the harassment continued until he was transferred to another cottage. The EEOC sent Shepherd a proposed "Charge of Discrimination," and when he returned this form on November 25, 1996, he identified the last date of harm as February 27, 1995. On May 7, 1997, the EEOC advised Shepherd that he had the right to institute a civil action under Title VII of the Civil Rights Act within ninety days.
The trial court noted that the instant complaint was filed on February 27, 1997, and that the last act of harassment or retaliation against Shepherd occurred on February 27, 1995, and the last such act against Saylor occurred on February 10, 1995. The court also noted that the last act of misconduct committed by defendant Gal was alleged to have occurred in December 1994. The court rejected plaintiffs' arguments that the harassment continued until March 18, 1995, the date Shepherd transferred and until August 1995 for Saylor, the date he retired. The judge also rejected plaintiffs' contention that the continuing violation theory applied in this case.
Therefore, the trial judge concluded that all of Saylor's claims were time-barred, including his constructive discharge claim. Regarding the one actionable event that occurred on February 27, 1995, the court noted that Shepherd alleged that Sclama was unfriendly and nasty to him all night during his shift. Sclama did not talk *226 to Shepherd but was very friendly with another cottage training technician and talked and joked with her most of the night. Shepherd claimed he felt sick and tense because of this treatment. The trial judge noted that there was no adverse employment decision taken as a result of this conduct and no altering of the terms or conditions of Shepherd's employment. The judge concluded that the February 27 conduct was not sufficiently severe or pervasive to be actionable.
The court also found that plaintiffs failed to establish a factual issue leading to the individual liability of Gal and Sclama. The court believed that there was no evidence that any supervisor abused their authority to create a hostile work environment. Accordingly, the judge granted summary judgment in favor of all defendants on all of plaintiffs' claims.

II.
A two-year statute of limitations governs LAD claims. Montells v. Haynes, 133 N.J. 282, 292, 627 A.2d 654 (1993). Plaintiffs acknowledged that the defendants began their retaliatory actions against them in November 1994, shortly after Sampson's and Greenfield's discrimination case came to trial. Because the complaint was filed on February 27, 1997, however, plaintiffs had to show that their cause of action accrued no earlier than February 27, 1995. Ali v. Rutgers, 166 N.J. 280, 765 A.2d 714 (2000). A cause of action accrues when the right to institute and maintain a suit first arises. Holmin v. TRW, Inc., 330 N.J.Super. 30, 35, 748 A.2d 1141 (App.Div.), certif. granted, 165 N.J. 531, 760 A.2d 785 (2000). Thus, unless the continuing violation theory applies, plaintiffs' suit was time-barred.
The continuing violation theory is an equitable exception to the statute of limitations. Bolinger v. Bell Atlantic, 330 N.J.Super. 300, 306, 749 A.2d 857 (App. Div.), certif. denied, 165 N.J. 491, 758 A.2d 650 (2000). In Ali v. Rutgers, supra, 166 N.J. at 285, 765 A.2d 714 the Court noted that when an individual is subject to a continual and cumulative pattern of tortious conduct, the statute does not begin to run until the wrongful action ceases. See also Wilson v. Wal-Mart Stores, 158 N.J. 263, 272, 729 A.2d 1006 (1999). "`[O]nce a pattern of harassment has created a psychologically offensive work environment, the status quo of such continuous wrongful conduct can be based on the harasser's mere presence.'" Id. at 272-73, 729 A.2d 1006 (quoting Bustamento v. Tucker, 607 So.2d 532, 541 (La.1992) (citations omitted)). Thus, when the acts are continuous "`on an almost daily basis, by the same actor, of the same nature, and the conduct becomes tortious and actionable because of its continuous, cumulative, and synergistic nature,' the statute of limitations period does not commence until the final act has occurred or the conduct has ceased." Wilson v. Wal-Mart, supra, 158 N.J. at 273, 729 A.2d 1006 (quoting Bustamento v. Tucker, supra, 607 So.2d at 542); Bolinger v. Bell Atlantic, supra, 330 N.J.Super. at 306, 749 A.2d 857.
For discriminatory conduct to fit within the continuing violation doctrine, it must be intentional, pervasive, and regular and consist of more than the occurrence of isolated or sporadic acts. In addition, the plaintiff must demonstrate that at least one act of harassment or discrimination occurred within the filing period. West v. Philadelphia Elec. Co., 45 F.3d 744, 754-56 (3d Cir .1995); Bolinger v. Bell Atlantic, supra, 330 N.J.Super. at 307, 749 A.2d 857; Beck v. Tribert, 312 N.J.Super. 335, 346, 711 A.2d 951 (App.Div.), certif. denied, 156 N.J. 424, 719 A.2d 1022 (1998). It is improper for an employee to invoke the doctrine to resurrect grievances "long past" by appending them to a current complaint. Erdmann v. Board of Educ. Union County Regional High School Dist. No. 1, 541 F.Supp. 388, 392 (D.N.J.1982).
To determine whether alleged violations are continuing, we must consider the subject matter of the violations (i.e., *227 whether they are of the same type), their frequency and their permanence. West v. Philadelphia Elec., supra, 45 F.3d at 755 n. 9; Bolinger v. Bell Atlantic, supra, 330 N.J.Super. at 307, 749 A.2d 857. It is recognized that hostile work environment claims often "straddle both sides of an artificial statutory cut-off date," West v. Philadelphia Elec., supra, 45 F.3d at 755 (citation omitted), and that to establish these claims, evidence is often relied on concerning events occurring long before the relevant filing periods. Ibid. The analysis should concentrate not on individual incidents, but on the overall scenario and the work atmosphere as a whole. Id. at 756.
It bears repeating in this case that on a motion for summary judgment, the evidence presented must be "viewed in the light most favorable to the non-moving party," and all inferences must be drawn in favor of that party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535-36, 540, 666 A.2d 146 (1995). Here, Shepherd alleged that defendants continued to discriminate against him until he transferred out of Cottage # 22, on March 18, 1995, and that the court erred in focusing only on his handwritten notes and on the documents he submitted with the administrative grievance he filed with the Department of Personnel.
Shepherd's administrative grievance was filed on March 2, 1995, only three days after he alleged that the so-called last harm occurred. However, Shepherd remained in Cottage # 22 another two weeks, and there is no evidence that anything changed. Sclama and Gal remained his supervisors and nothing dissipated whatever antipathy they felt toward Shepherd for his role in the discrimination law suit. Thus, it was reasonable to infer that the same conduct he had been subjected to for the prior three or four months continued. Moreover, in his EEOC complaint, filed several months after Shepherd's administrative grievance, Shepherd specifically indicated that the dates of harm ran from November 1994 to March 1995 and that the harassment continued until he transferred to a different cottage.
With respect to Saylor, in opposing summary judgment, Saylor submitted a certification in which he identified several specific acts which occurred after February 27, 1995. For example, on March 3, 1995, Sclama accused Saylor of using the "F" word in front of clients. On April 5, 1995, Sclama brought another disciplinary charge against Saylor for using foul language on January 20, 1995. On April 19, 1995, the assistant supervisor of professional residential services wrote to Saylor cautioning him regarding his abuse of sick leave.
Thus, both Shepherd and Saylor had evidence supporting their contention that the last act of retaliation occurred within the two-year filing period. However, the trial court also found that the harassment alleged by plaintiffs did not rise to the level of pervasive, regular and intentional conduct.
The very essence of a hostile work environment claim is its continuing nature. Rarely will just one act of harassment alert an employee to a potential lawsuit. It is only when the same type of conduct continues over and over again, "on an almost daily basis," for a prolonged period of time, that the employee will realize that he or she has a cause of action. That was the very situation that confronted the plaintiffs here.
Sampson and Greenfield were subjected to purposeful racial discrimination that upper-level management knew and lied about and even tried to cover up. Whatever factors motivated defendants to discriminate against Sampson and Greenfield and then lie about it in 1989 or 1990 were still present in the work place as evidenced by defendants telling plaintiffs that they would pay for supporting their former co-workers. Viewed in this light, plaintiffs established a policy or practice of continuing discrimination. Yet, plaintiffs candidly *228 admitted that until the Sampson and Greenfield case came to trial, their working conditions were relatively peaceful. Plaintiffs did not assert the long past grievances of 1989 and 1990. It was only after the case came to trial that the harassment started anew. This was not a case where plaintiffs were merely trying to resurrect grievances "long past" by appending them to a current complaint.
The grievances that plaintiffs established from November 1994 until March 1995 were sufficiently similar in nature, frequent in occurrence, and permanent in duration to be considered "continuing." The close supervision, absence of social contact, direct hostility, specific and inferential threats, and the disciplinary charges all began after the trial started and continued until Shepherd transferred and Saylor applied for early retirement. Plaintiffs were not subjected to sporadic and isolated incidents, but rather to pervasive, regular and intentional conduct. We believe that plaintiffs' complaint should not have been dismissed based on the statute of limitations bar because the complaint asserted continuing violations and was, therefore, timely brought.

III.
Because the trial judge found all of Saylor's claims time-barred, he considered the merits of only Shepherd's February 27, 1995 allegation. The judge believed that this one episode was not sufficiently severe or pervasive to lead a reasonable person to believe that the terms or conditions of employment had been altered. Consequently, he dismissed Saylor's and Shepherd's claims that they were subjected to a hostile work environment. Because of the continuing nature of the harassment, however, the entire period of harassment must be considered.
To establish a cause of action based on a hostile work environment, plaintiff must prove conduct that would not have occurred but for the employee's protected status under the LAD, that is severe or pervasive enough to make a reasonable person believe the conditions of employment have been altered and that the working environment is hostile or abusive. Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 603-04, 626 A.2d 445 (1993).
Defendants do not concede that plaintiffs were in a protected status by virtue of their support of the racial discrimination claim. However, N.J.S.A. 10:5-12d, provides that it is unlawful "to coerce, intimidate, threaten or interfere with any person... on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the act." In view of plaintiffs' assistance of Greenfield's and Sampson's litigation, plaintiffs' status to sue under the LAD is, at the very least, a question of fact to be resolved at trial. Accordingly, we proceed to analyze defendants' strong contention that defendants' conduct was not sufficiently severe or pervasive to constitute an LAD violation.
It is the harassing conduct that must be severe or pervasive, not its effect on the employee or the work environment. Lehmann, supra, 132 N.J. at 606, 626 A.2d 445. The conduct must be severe enough to make a reasonable person in the protected group believe that the conditions of work have been altered and that the environment is hostile or abusive. Taylor v. Metzger, 152 N.J. 490, 506, 706 A.2d 685 (1998). Evidence of specific, tangible, adverse changes are not required. Id. at 507, 706 A.2d 685.
Moreover, by using the disjunctive requirement of "severe or pervasive," Lehmann recognized that many plaintiffs claiming a hostile work environment allege numerous incidents that, if considered individually, would not be sufficiently severe to make the work environment intimidating or hostile. Lehmann v. Toys `R' Us, supra, 132 N.J. at 607, 626 A.2d 445. The severity or seriousness of the conduct may vary inversely with the pervasiveness or *229 frequency of the conduct, and, therefore, the court "must consider the cumulative effect of the various incidents." Ibid.
We agree with defendants that some of the acts of harassment charged by plaintiffs do not suffice by themselves to constitute a hostile work environment. The LAD is not a general civility code for workplace conduct. Neither rudeness nor lack of sensitivity alone constitutes harassment, and simple teasing, offhand comments, and isolated incidents do not constitute discriminatory changes in the terms and conditions of one's employment. Heitzman v. Monmouth County, 321 N.J.Super. 133, 147, 728 A.2d 297 (App. Div.1999).
Thus, a supervisor's decision to no longer socialize with a worker or be cordial would not alone be actionable. In this case, however, we must be sensitive to the nature of this particular employment. Sclama's and Gal's acts to isolate and alienate plaintiffs from their colleagues and the administration were taken in an unusual work environment. The parties worked with only a few other persons in a residential cottage housing thirty-two physically and mentally disabled adult males. To adequately service such a clientele, greater cordiality and cooperation is required among coworkers than in many other work environments.
In addition, and most significantly, the supervisors' conduct has to be viewed in the context of other remarks made by Sclama and Gal, which were actionable. For example, because plaintiffs supported their coworkers in the racial discrimination law suit, both defendants were alleged to have threatened plaintiffs that they would be more closely supervised and managed than other employees who had not taken the "wrong" side in the Sampson/Greenfield litigation. Moreover, plaintiffs were treated differently from the manner in which they were treated before the Sampson/Greenfield litigation. On more than one occasion Gal told plaintiffs that, "what goes around comes around," in reference to their support of the litigation. Plaintiffs alleged that Sclama and Gal cruelly made what would normally be difficult work situations purposely more trying. Both plaintiffs also alleged that they were not given little "perks" that other employees were given, and Saylor in particular alleged that Sclama started to write him up for picayune violations of work rules. Taken together and considered in the context of the work environment, plaintiffs' grievances appear more serious than trivial.
Again, by themselves, these instances might not be actionable. A supervisor is obviously allowed to enforce work rules and regulations. However, their enforcement must be even-handed and cannot discriminate against employees based on their protected status. So, when a supervisor verbally chastises an employee for defending the rights of minority coworkers who choose to sue the employer (and prevail in their suit), the conduct starts to look more nefarious than benign.
Moreover, this case was decided on summary judgment. Under such circumstances, the trial judge must give plaintiffs the benefit of all favorable inferences from the evidence presented, and their allegations should have been accepted as true. Once the plaintiffs' allegations are viewed in this light and sensitivity is accorded the unique work environment, we believe that plaintiffs established a factual dispute regarding whether Sclama and Gal created a hostile work environment for plaintiffs. Thus, summary judgment should not have been granted on this claim.

IV.
Plaintiffs argue that the trial court also erred in dismissing their retaliation claim on the ground they failed to prove an adverse employment decision. To establish a cause of action for retaliation under the LAD, plaintiff must prove that he or she engaged in protected activity *230 known to the defendant, that he or she was subjected to an adverse employment decision by the defendant and that there was a causal link between the protected activity and the adverse employment decision. Woods-Pirozzi v. Nabisco Foods, 290 N.J.Super. 252, 266-67, 675 A.2d 684 (App.Div.1996); Romano v. Brown & Williamson Tobacco Corp., 284 N.J.Super. 543, 548-49, 665 A.2d 1139 (App.Div.1995); Jamison v. Rockaway Township Bd. of Educ., 242 N.J.Super. 436, 445, 577 A.2d 177 (App.Div.1990). Once plaintiff establishes these three factors, the burden then shifts to defendant to articulate a legitimate, non-retaliatory reason for the action. The plaintiff must then show that a retaliatory intent motivated the defendant's actions, either indirectly by proof that the proffered reason is pretext or directly by demonstrating that a discriminatory reason is more likely than not what motivated the defendant's decision. Woods-Pirozzi v. Nabisco, supra, 290 N.J.Super. at 274, 675 A.2d 684; Romano v. Brown & Williamson, supra, 284 N.J.Super. at 549, 551, 665 A.2d 1139.
Here, the only question the parties dispute is whether plaintiffs proved that they were subjected to an adverse employment decision. Plaintiffs cite two cases as support for their position that retaliatory harassment, rather than an adverse employment decision, may form the basis for a retaliation claim. Hurley v. Atlantic City Police Dep't, 933 F.Supp. 396 (D.N.J. 1996), aff'd, 174 F.3d 95 (3d Cir.1999), cert. denied, 528 U.S. 1074, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000), and Goldsmith v. E.I. duPont de Nemours & Co., 571 F.Supp. 235 (D.Del.1983).
There is no doubt that evidence of pervasive harassment may make a retaliation claim more credible. Hurley v. Atlantic City, supra, 174 F.3d at 111. However, both of the cases cited by plaintiffs involved employer action that was in addition to, and different from, the underlying conduct that gave rise to the hostile work environment. In Hurley, plaintiff alleged that she was transferred to a different and undesirable assignment and was denied a thirty-percent pay raise. 933 F.Supp. at 406. In Goldsmith, besides excessive monitoring and other forms of harassment, plaintiff alleged an assignment to menial tasks, hindrance from pursuing promotional opportunities, placement on probation and discharge. 571 F.Supp. at 239.
In some situations, it is possible for retaliatory harassment to amount to adverse employment action. In Breaux v. City of Garland, 205 F.3d 150, 160 (5th Cir.), cert. denied, ___ U.S. ___, 121 S.Ct. 52, 148 L.Ed.2d 21 (2000), for example, the court found that harassment can rise to such level when the harassment constitutes a constructive adverse employment action. Thus, adverse employment action would be proven if defendants create such an intolerable situation that plaintiff is forced to transfer to a less desirable position. Ibid. But, generally, harassment alone is not an adverse employment action. Zamboni v. Stamler, 847 F.2d 73, 82 (3d Cir.1988), cert. denied, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988).
In the instant case, Shepherd must be distinguished from Saylor. Neither Shepherd nor Saylor alleged that they were assigned to different or less desirable tasks, or that they were denied employment benefits or monetary raises. Shepherd did transfer from Cottage # 22; though hardly "voluntary," his transfer ultimately worked out well for him, and he was happier in his new assignment. While there was some stress involved in the transfer, emotional factors alone cannot constitute adverse employment action. Thus, as to Shepherd, the course of harassment he alleged was insufficient to establish an adverse employment decision.
Saylor, however, claimed that the harassment caused him to take early retirement and constituted a constructive discharge. An employer will be held liable for constructively discharging an employee when the employer knowingly permits conditions *231 of discrimination in employment so intolerable that a reasonable person subject to them would resign. Woods-Pirozzi v. Nabisco, 290 N.J.Super. at 276, 675 A.2d 684; Muench v. Township of Haddon, 255 N.J.Super. 288, 302, 605 A.2d 242 (App.Div.1992). However, an employee has the obligation to do what is necessary and reasonable in order to remain employed rather than simply quit. A trial court should consider the nature of the harassment, the closeness of the working relationship between the harasser and the victim, whether the employee resorted to internal grievance procedures, the responsiveness of the employer to the employee's complaints, and all other relevant circumstances. Woods-Pirozzi v. Nabisco, supra, 290 N.J.Super. at 276, 675 A.2d 684; T.L. v. Toys `R' Us, Inc., 255 N.J.Super. 616, 663, 605 A.2d 1125 (App.Div.) (Skillman, J.A.D., concurring in part and dissenting in part), certif. denied, 130 N.J. 19, 611 A.2d 657 (1992), aff'd as modified on other grounds sub nom. Lehmann v. Toys `R' Us, 132 N.J. 587, 626 A.2d 445 (1993).
Obviously, an employee who is subjected to discriminatory treatment that is pervasive and regular, rather than isolated or occasional, will usually be better able to establish that working conditions became so intolerable that any reasonable employee would resign. T.L. v. Toys `R' Us, supra, 255 N.J.Super. at 663-64, 605 A.2d 1125 (Skillman, J.A.D., concurring in part and dissenting in part). Or, if management totally rebuffs an employee's charges of discriminatory conditions, instead of investigating and instituting appropriate corrective measures, the employee's claim of constructive discharge is more likely to be sustained. Id. at 664, 605 A.2d 1125 (Skillman, J.A.D., concurring in part and dissenting in part).
Moreover, a constructive discharge claim should not ordinarily be based solely on an allegation of overzealous supervision of one's work. Such an allegation must be critically examined so that an employer is not thwarted from insisting on high standards through non-discriminatory efforts. Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1162 (3d Cir.), cert. denied, 510 U.S. 964, 114 S.Ct. 441, 126 L.Ed.2d 374 (1993). In addition, whether there has been a constructive discharge is a "fact-driven determination." Muench v. Township of Haddon, supra, 255 N.J.Super. at 302, 605 A.2d 242.
Here, Saylor's constructive discharge allegation saves his retaliation claim from dismissal on summary judgment. Plaintiff must establish unlawful retaliation or some other violation of the LAD or public policy before he can maintain a claim for constructive discharge. Gallo v. Princeton Univ., 281 N.J.Super. 134, 149-50, 656 A.2d 1267 (App.Div.), certif. denied, 142 N.J. 453, 663 A.2d 1359 (1995).
Viewing the evidence from Saylor's perspective, his employer discriminated against him over a four-month period by making his working conditions intolerable; there was a close physical working relationship between Saylor and his alleged harassers; Saylor pursued internal grievance procedures to complain about the harassment; and his employer, according to Saylor, half-heartedly responded to these complaints. Also, Saylor claimed that he did not want to voluntarily transfer, as Shepherd did, because he felt there were distinct disadvantages to starting out all over again in a new cottage. Given the conduct of his immediate supervisors, we believe that the reasonableness of Saylor's decision to choose early retirement was a question of fact to be determined at trial.
Therefore, summary judgment dismissing Saylor's retaliation claim was inappropriate. However, because Shepherd did not submit sufficient evidence of an adverse employment decision, the trial judge properly granted summary judgment dismissing Shepherd's retaliation claim.

*232 V.
Plaintiffs argue that the court erred in dismissing their claim against HDC for vicarious liability, and that HDC was liable because it failed to take effective measures to protect them from a hostile work environment. In cases of supervisory harassment, whether the "quid pro quo" or "hostile work environment" type, the employer is directly and strictly liable for all equitable damages and relief. Lehmann v. Toys `R' Us, supra, 132 N.J. at 617, 626 A.2d 445; Heitzman v. Monmouth County, supra, 321 N.J.Super. at 144, 728 A.2d 297. With respect to compensatory damages, including those for emotional distress, principles of agency law govern whether an employer is liable. An employer, whose supervisory employee acts within the scope of employment, will be liable for the supervisor's conduct in creating a hostile environment. Lehmann v. Toys `R' Us, supra, 132 N.J. at 619, 626 A.2d 445; Woods-Pirozzi v. Nabisco, supra, 290 N.J.Super. at 267, 675 A.2d 684.
Where the supervisor acts outside the scope of employment, the employer will still be liable "in most cases" under the exceptions found in Restatment (Second) of Agency § 219(2) (1958). Moreover, negligence may also create employer liability. Id. at § 219(2)(b). Thus, the plaintiff may show the employer was negligent by its failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training and/or monitoring mechanisms. Lehmann v. Toys `R' Us, supra, 132 N.J. at 621, 626 A.2d 445; Woods-Pirozzi v. Nabisco, supra, 290 N.J.Super. at 268, 675 A.2d 684. In addition, under Restatement (Second) of Agency, supra, § 219(2)(a), an employer will also be liable if it had actual knowledge of the harassment and did not promptly and effectively act to stop it. Lehmann v. Toys `R' Us, supra, 132 N.J. at 622, 626 A.2d 445; Payton v. New Jersey Turnpike Auth., 292 N.J.Super. 36, 45, 678 A.2d 279 (App.Div.1996), aff'd, 148 N.J. 524, 691 A.2d 321 (1997); Woods-Pirozzi v. Nabisco, supra, 290 N.J.Super. at 268, 675 A.2d 684.
In this case, both harassing defendants, Sclama and Gal, were direct supervisors of plaintiffs. As such, HDC could be found liable either if it acted negligently with respect to the harassing conduct of defendants, or if the employment relationship aided those defendants in inflicting injury on plaintiffs. Thus, it would be for the fact-finder to determine whether HDC had in place well-publicized anti-harassment policies, informal or formal complaint structures, mandatory training requirements, or mechanisms for monitoring the workplace, and whether the commitment to anti-harassment "came from the top." Lehmann v. Toys `R' Us, supra, 132 N.J. at 621, 626 A.2d 445. It would also be for the fact-finder to determine whether HDC delegated authority to Sclama and Gal to control the situation about which plaintiffs complained, whether Sclama and Gal exercised that authority, whether their exercise of that authority resulted in a LAD violation, and whether the authority delegated to them aided them in injuring plaintiffs. Id. at 620, 626 A.2d 445. Therefore, all of these factual questions precluded summary judgment of plaintiffs' claim against HDC alleging vicarious liability for the conduct of Sclama and Gal.

VI.
The trial court ruled that in order for Sclama and Gal to be individually liable as aiders and abettors under the LAD, plaintiffs had to demonstrate that defendants shared a community of purpose with the HDC. Since the most that plaintiffs showed, according to the trial court, was that they had an unpleasant relationship with Sclama, the court found no evidence of individual liability. We have already explained why we disagree with the trial court's assessment of plaintiffs' hostile work environment claim. In our view, considering the evidence from plaintiffs' *233 perspective also requires a different result regarding Sclama's and Gal's individual liability.
N.J.S.A. 10:5-12a prohibits unlawful employment practices or unlawful discrimination only by "an employer." An individual supervisor is not defined as an "employer" under the LAD. N.J.S .A. 10:5-5e. However, N.J.S.A. 10:5-12e deems it unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." To "aid" means "to assist, support or supplement the efforts of another," and to "abet" means "to encourage, counsel, incite or instigate." Baliko v. Stecker, 275 N.J.Super. 182, 191, 645 A.2d 1218 (App.Div. 1994), certif. denied, 162 N.J. 199, 743 A.2d 851 (1999) (citing State v. Newell, 152 N.J.Super. 460, 469, 378 A.2d 47 (App.Div. 1977) and several civil cases).
The federal courts in New Jersey have struggled with the meaning of "aiding and abetting" within this context, and there appear to be three tests that have been developed for employee liability under N.J.S.A. 10:5-12e. In Tyson v. CIGNA Corp., 918 F.Supp. 836 (D.N.J.1996), aff'd, 149 F.3d 1165 (3d Cir.1998), the court noted that N.J.S.A. 10:5-12e adds accomplice liability to the statute. When read in conjunction with N.J.S.A. 10:5-12a, it forbids any person to aid or abet an employer's discriminatory conduct. Id. at 840. To aid or abet, the individual must willfully and knowingly associate himself or herself with the unlawful act, and seek to help make the act succeed. The defendant must share the same intent as the one who actually committed the offense. Ibid.
According to Tyson, a supervisor who engages in discriminatory conduct, while acting within the scope of employment, shares the intent of his or her employer and may thus be held individually liable as an accomplice. Ibid. However, this is not true when the supervisor acts outside the scope of employment because the employer in that situation is liable for the conduct only insofar as it fails to adequately respond to it. Id. at 841, 842 n. 10. Moreover, in order to find a supervisor individually liable, he or she must affirmatively engage in discriminatory conduct. Mere inaction, passivity or acquiescence do not suffice. Id. at 841. The same rationale appears in several other district court cases. E.g., Ferraro v. Bell Atlantic Co., 2 F.Supp.2d 577, 584-85 (D.N.J.1998); Caldwell v. KFC Corp., 958 F.Supp. 962, 971 (D.N.J.1997); Hurley v. Atlantic City Police Dep't, supra, 933 F.Supp. at 416-17.
The Third Circuit, in reviewing Hurley, followed Failla v. City of Passaic, 146 F.3d 149 (3d Cir.1998). In Failla, the court rejected Tyson's view that individual liability under N.J.S.A. 10:5-12e was based on the concept of "shared intent" and found it irrelevant whether a supervisor had acted within the scope of employment. 146 F.3d at 156-57. The Third Circuit concluded that an employee aids or abets a LAD violation when he or she knowingly gives substantial assistance or encouragement to the unlawful conduct of the employer. Id. at 157-58 (relying on Restatement (Second) of Torts § 876(b) (1979) to define aiding and abetting liability); accord Hurley v. Atlantic City, supra, 174 F.3d at 126. Under this test, employees are not liable as aiders or abettors merely if they have some role, knowledge, or involvement in the illegal conduct. The standard is set above mere knowledge or implementation "lest a reverse respondeat superior liability... be created under the guise of aiding and abetting." Failla v. City of Passaic, supra, 146 F.3d at 159.
In Jones v. Jersey City Medical Center, 20 F.Supp.2d 770, 774 (D.N.J.1998), the district court established a liability standard gleaned from both Tyson and Failla. Here, the court concluded that to be individually liable under the LAD, a person must intend to facilitate discrimination, must share a community of discriminatory purpose with the actual perpetrator, must be a supervisor, and must engage *234 in affirmative acts of discrimination within the scope of employment. In addition, the individual must know of the principal's discriminatory conduct, must know that such conduct involves a breach of duty, and must actually assist or encourage the unlawful act. Id. at 774-75.
We need not, in this case, decide the appropriate test for assessing aiding and abetting liability under the LAD because no matter which test is applied, we conclude that summary judgment was improvidently granted. Under Tyson and Jones, plaintiffs had to show that defendants were acting within the scope of their employment when they created a hostile work environment. Because Sclama and Gal were promoting the interests of HDC when they chastised plaintiffs for supporting Sampson and Greenfield, at the very least, plaintiffs established a question for the factfinder at trial.
Under Failla/Hurley, plaintiffs had to show that Sclama and Gal were giving substantial encouragement to the unlawful conduct of their employer. Because the employer's unlawful conduct was racial discrimination against Sampson and Greenfield, and Sclama and Gal retaliated against plaintiffs for helping Sampson and Greenfield prevail against their employer on this claim, a reasonable factfinder could conclude that plaintiffs made this showing. Unlawful discrimination in the workplace is fostered when employees such as these two plaintiffs are deterred from speaking out for fear that they too will be discriminated against. Without the encouragement and assistance of harassers such as Sclama and Gal, employers would be unsuccessful in carrying out their unlawful policies. Therefore, summary judgment should not have been granted in favor of Sclama and Gal. Their liability must be resolved by trial, and we leave to the trial judge to decide initially which test to apply in assessing aiding and abetting liability under the LAD.
We also note that in our opinion, Newsome v. Administrative Office of The Courts, 103 F.Supp.2d 807 (D.N.J.2000), cited by Judge Wefing in her dissent, is inapplicable to this case. In Newsome, there was no suggestion that the defendant sexually harassed plaintiff to further the interests of defendant employer. Id. at 818. Thus, the District Court, in dismissing the individual liability claim against the harassing defendant, observed that it would be illogical to contend that a principal wrongdoer can aid or abet his or her own wrongful conduct. We acknowledge that when the challenged conduct is failing to stop the supervisor's own harassment, the theory of liability becomes "somewhat awkward." Hurley v. Atlantic City, supra, 174 F.3d at 126.
In this case, however, there is at least a factual dispute as to whether Sclama and Gal were promoting the interests of HDC when they harassed plaintiffs for supporting Sampson and Greenfield. Therefore, the aiding and abetting analysis is apropos to their actions, at least at the summary judgment phase of this case. In Hurley, Judge Cowen, dissenting in part, would have ruled that supervisors are liable for their own discriminatory behavior under N.J.S.A. 10:5-12a because the Legislature intended to include individuals acting on behalf of their employer within the coverage of the statute. Id. at 139-40 (Cowen, J., concurring in part and dissenting in part).

VII.
Concerning the individual liability plaintiffs asserted against William Wall, HDC's Superintendent; Leon Cronce, Assistant Superintendent; and Arthur Searfass, Assistant Supervisor of Professional Residential Services, we conclude that plaintiffs raised insufficient evidence in opposition to defendants' motion to withstand summary judgment. These defendants' alleged negligent or passive response to plaintiffs' complaints of harassment and retaliation is relevant in plaintiffs' hostile work environment claim and Saylor's retaliation *235 claim. However, plaintiffs' complaint against them individually was properly dismissed. Moreover, plaintiffs did not indicate in their brief why they believed Wall, Cronce and Searfass were individually liable. This failure, results in abandonment of the issue. Muto v. Kemper Reinsurance Co., 189 N.J.Super. 417, 420-21, 460 A.2d 199 (App.Div.1983). We note that plaintiffs have also voluntarily dismissed their complaint against Vincent Murante and Donald Stambaugh, two other cottage training supervisors.
Finally, plaintiffs argue that the trial court erred by dismissing as a matter of law their claim against Sclama and Gal for negligent supervision and conspiracy liability under the LAD. Plaintiffs are not asserting a common law conspiracy claim, but instead appear to be relying on N.J.S.A. 10:5-12e. Evidence of any conspiracy would, therefore, not establish a separate claim under the LAD, but would be part of plaintiffs' proofs that Sclama and Gal should be individually responsible. In addition, there appears to be no evidence supporting a separate so called negligent supervision claim against Sclama and Gal. Again, to the extent management responded ineffectively to plaintiffs' work place complaints, this evidence would be relevant in plaintiffs' hostile work environment claim and Saylor's retaliation claim. However, the separate claims against Sclama and Gal for negligence and conspiracy under the LAD were properly dismissed. Consequently, it is not necessary for us to consider defendants' alternative arguments for affirming the trial judge's dismissal of these claims, such as the workers' compensation law or the Tort Claims Act immunity.
To recap, we conclude, for the reasons explained above, that Shepherd's retaliation claim and both plaintiffs' claims for conspiracy and negligent supervision under the LAD were properly dismissed. Plaintiffs claims against defendants Wall, Cronce and Searfass, individually, were also properly dismissed. The dismissal of plaintiffs' hostile work environment claim and Saylor's retaliation claim against HDC and Sclama and Gal individually is reversed and remanded for trial. Summary judgment on these claims was inappropriately granted.
Affirmed in part, reversed in part and remanded in part.
WEFING, J.A.D., dissenting.
My colleagues have concluded that the trial court erred when it granted summary judgment to Hunterdon Developmental Center (HDC), a State-operated facility that provides long-term care for physically and mentally handicapped clients, and two of its employees, Mario Sclama and Ida Gal, who were sued by plaintiffs, William Shepherd and Richard Saylor under New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 through -49. The trial court concluded that plaintiffs' claims were barred by the statute of limitations. My colleagues, relying on Wilson v. Wal-Mart, 158 N.J. 263, 729 A.2d 1006 (1999), have determined that under the continuing violation theory the plaintiffs' claims are not barred. They have also concluded that plaintiffs have set forth a sufficient prima facie showing that these defendants were responsible for a hostile work environment. I am unable to agree with either proposition and therefore dissent.
Before turning to the substantive merits of the questions presented, I am compelled to note one aspect of the factual background of this matter set forth by the parties and my colleagues. All refer to a prior lawsuit commenced by Annie Sampson and Donald Greenfield, who had, some years earlier, been plaintiffs' co-workers in Cottage 22 at HDC. Although Sampson and Greenfield prevailed in that lawsuit in which they alleged various incidents of racial discrimination and harassment, no judgment was entered against defendant Ida Gal in that earlier litigation, according to the copy of the judgment supplied to us in connection with our review of this matter.

*236 I
I turn first to the question whether plaintiffs are entitled to invoke the continuing violation theory to save their cause of action. There are two reported New Jersey Supreme Court cases which have utilized the continuing violation theory in the context of an employment-related claim asserted under LAD, Wilson v. Wal-Mart, supra, and Ali v. Rutgers, 166 N.J. 280, 765 A.2d 714 (2000). Both indicate to me that the continuing violation theory is inapplicable to this case. The plaintiff in Wilson alleged claims of sexual harassment and age and sex discrimination. She commenced work for K-Mart in August 1990, and during the course of her employment was supervised by Rocco Gallo who continuously made crude and indecent remarks to her. Id. at 267, 729 A.2d 1006. In January 1994, K-Mart sold to Wal-Mart the store in which she and Gallo worked. Gallo remained her supervisor and continued his offensive conduct. On March 4, 1994, she was terminated by Wal-Mart and on March 6, 1996, she filed a complaint under LAD against Gallo, K-Mart and Wal-Mart. Id. at 267-268, 729 A.2d 1006. In that context, this court determined that K-Mart was entitled to summary judgment because plaintiff had not presented her claim within two years of her employment by K-Mart. In reversing that determination and remanding the matter for trial, the Supreme Court noted the very limited context of the question before it and the answer it provided.
The secondary question is whether the claim against K-Mart is barred by the statute of limitations because it was not brought within two years of the last date of plaintiff's employment with K-Mart. That question requires consideration of the problem of successor liability when both predecessor and successor employers are alleged to have contributed to the creation of a hostile work environment.
[Wilson, supra, 158 N.J. at 266, 729 A.2d 1006.]
Those factors are entirely absent from the present matter, however. Plaintiffs worked continuously at HDC, Shepherd from 1983, Saylor from 1984. They never experienced a change in the identity of their employer that might put into question which of several entities should bear responsibility for a course of conduct in which all might have engaged over a course of time. There is no question here of successor liability.
In addition, in both Wilson and Ali, plaintiffs alleged a course of conduct that continued over a span of years. Wilson was subjected to Gallo's offensive conduct for approximately four years. Wilson, supra, 158 N.J. at 267, 729 A.2d 1006. Ali was employed by Rutgers approximately fifteen years. Ali, supra, 166 N.J. at 286, 765 A.2d 714.
Here, under the most generous reading of plaintiffs' allegations, we are concerned with conduct of no more than several months' duration. They both date the alleged wrongful actions as starting in November 1994, and in March 1995, Shepherd transferred from Cottage 22 and Saylor put in for retirement. In my view, the wholesale application of the theory of continuous violation is unwarranted to this factual complex, particularly in the context of continuous employment by a State-operated facility.
I must stress that my disagreement with my colleagues springs, not from a wholesale rejection of the continuing violation theory, but from my conviction that it is inapplicable to this matter.
The continuing violation theory is analogous to the concept of a continuing tort. New Jersey courts have not hesitated to utilize that doctrine to provide relief in appropriate instances, such as when a victim of repeated violence may "sink into a state of psychological paralysis and become unable to take any action at all to improve or alter the situation." Giovine v. Giovine, 284 N.J.Super. 3, 11, 663 A.2d 109 (App.Div.1995) (citations omitted), overruled *237 on other grounds, Kinsella v. Kinsella, 150 N.J. 276, 696 A.2d 556 (1997). That however, is a far cry from the case at hand. We have also referred to it in LAD claims. See Terry v. Mercer County Bd. of Chosen Freeholders, 173 N.J.Super. 249, 253, 414 A.2d 30 (App.Div.1980), modified on other grounds, 86 N.J. 141, 430 A.2d 194 (1981) (holding that discriminatory conduct in the form of unequal wages and refusals to promote are continuing violations for purposes of determining whether claim is barred from relief); Decker v. Board of Educ. of Elizabeth, 153 N.J.Super. 470, 474, 380 A.2d 285 (App.Div.1977) (recognizing the act of sex discrimination as continuing violation), certif. denied, 75 N.J. 612, 384 A.2d 842 (1978).
The fact that the Supreme Court referred to the continuing violation theory in an employment context in Wilson, supra, does not mean, however, that it should be translated wholesale into the legal relationships between employers and employees, extending the potential for liability into an indefinite, ill-defined future. Courts have referred to the concept of the continuing violation theory itself as "`muddled' and `misguided and unnecessary.'" Bolinger v. Bell Atlantic, 330 N.J.Super. 300, 307, 749 A.2d 857 (App. Div.), certif. den. 165 N.J. 491, 758 A.2d 650 (2000), citing Thomas v. Eastman Kodak Co., 183 F.3d 38, 53 (1st Cir.1999), cert. den. 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000). The continuous violation theory has a circumscribed parameter when it is invoked to defeat an assertion of an otherwise applicable statute of limitations.[1]
If it is only with the benefit of hindsight, after a series of discriminatory acts, that the plaintiff can realize that he is indeed a victim of unlawful discrimination, he can sue in regard to all of the acts provided he sues promptly after learning their character, even if the statute of limitations has run on all of them. If, however, he knows or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed him, he may not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one. So the fact that a series of discriminatory or otherwise unlawful acts is indeed a series, a continuum, rather than a concatenation of unrelated acts, will delay the deadline for suing with respect to the earliest acts in the series only if their character was not apparent when they were committed but became so when viewed in the light of the later acts. Only in such a case is it proper to describe the acts as adding up to a "continuing violation" that allows the plaintiff to defer suing until the end of the statutory period .....
[Moskowitz v. Trustees of Purdue University, 5 F.3d 279, 281-282 (7th Cir.1993) ]
Here, these plaintiffs were fully aware of the character of the acts of which they now complain at the time they were committed; they did not have to wait for a particular event to occur to shed light on their experiences. Further, at the time the acts were committed, plaintiffs believed them to be retaliatory. The passage of time added nothing to their understanding of their situation.
A statute of limitations is designed to foster the prompt assertion of claims and prevent the litigation of stale ones. Montells v. Haynes, 133 N.J. 282, 292-93, 627 A.2d 654 (1993); Ochs v. Federal Ins. Co., 90 N.J. 108, 112, 447 A.2d 163 (1982). That is particularly a desirable objective within the context of the employer-employee relationship. Allowing claims to accumulate over a period of time can permit disputes and antagonisms to fester, further poisoning a contentious workplace atmosphere. The Supreme Court has recognized *238 the critical need for prompt disposition of claims of discrimination and harassment in the workplace. "Evidence of discrimination ... is vulnerable to the passage of time.... Fairness to the accuser, the accused, and to the judicial system require a timely adjudication of discrimination claims." Montells, supra, 133 N.J. at 293, 627 A.2d 654.
Further, it should not escape notice that we are dealing with a public entity, a State-operated facility. Plaintiffs should receive the full measure of justice to which they are entitled, but we should be cautious about extending the scope of potential liability.
At bottom, analysis of the question whether these claims are time-barred involves a careful consideration and balancing of the respective rights of these employees against those of the public employer. It also requires recognition of New Jersey's strong commitment to the "eradication of the cancer of discrimination," Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 600, 626 A.2d 445 (1993), quoting Fuchilla v. Layman, 109 N.J. 319, 334, 537 A.2d 652, cert. denied sub nom. University of Medicine & Dentistry of N.J. v. Fuchilla, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988), and to the protection of employees from abusive working environments. Taylor v. Metzger, 152 N.J. 490, 508, 706 A.2d 685 (1998); Lehmann, supra, 132 N.J. at 603-04, 626 A.2d 445. After a careful review of the record, I can perceive nothing unfair about holding these employees to the two-year statute of limitations governing their rights under LAD. Indeed, they were, no later than January 1996, represented by counsel and well able to assert their claims in a timely fashion. For whatever reason, they failed to do so. We should not utilize distinguishable precedent and an inapplicable theory to revive those claims.
I reiterate for the sake of completeness that plaintiffs date their claims as commencing in the fall of 1994, more than one year after the Court's opinion in Montells, supra. This matter is thus unaffected by the Court's opinion in Ali v. Rutgers, supra, in which certain of the operative facts occurred prior to Montells while other operative facts occurred after the decision in Montells was issued; in that posture the Court concluded the appropriate limitations period to be "the earlier of six years from the date of accrual or two years" from November 30, 2000, the date Ali was decided. 166 N.J. at 286, 765 A.2d 714.

II
My colleagues also conclude that the actions of which plaintiffs complain state a prima facie cause of action for a hostile work environment. I am also unable to subscribe to that conclusion.
Plaintiffs complain that the actions of Sclama and Gal created a hostile work environment when the Sampson-Greenfield trial commenced in November 1994. As proof of the existence of a hostile work environment, they allege that Sclama would only talk to them about work-related items, that he would not say "please" or "thank you", that he seemed angry all the time and excluded them from what many would consider the normal incidents of a shared work environment. Shepherd complained in his deposition that once the trial commenced, Sclama and Gal no longer shared meals with them and, in particular, that Sclama stopped cooking spaghetti dinners for the shift. He noted that Sclama would no longer discuss baseball with him. One may criticize Sclama's style of management but that does not equate, in my view, with a hostile work environment for purposes of LAD.
I have no doubt that the work environment in Cottage 22 became tense during the time that the Sampson and Greenfield matter was being tried. Litigation is, by its very nature, stressful for all those who participate in it. I hesitate, however, to translate the manifestations of that stress into yet another cause of action.
*239 Further, many of plaintiffs' complaints rest upon their own assumptions about the motives of others. Plaintiff Shepherd, when asked to list examples of the retaliatory conduct of Sclama and Gal, included an incident in January 1995 when he reported to Gal that one of his clients needed medication to calm down and Shepherd had to wait three hours for the medication to arrive. He admitted in his deposition he had "no idea" whether Gal had promptly called for the medication when he contacted her. The record is barren of any evidence that she purposely withheld the medication in order to make his shift more difficult or indeed that the delay was in any way attributable to her at all.
Plaintiff Shepherd also complained that on February 10, 1995, when he was signing into work, another employee entered the room and spoke to Sclama and Gal about a newspaper report of the State's appeal of the judgment in the Sampson-Greenfield matter. According to Shepherd, the three laughed, saying Sampson and Greenfield would not recover any of the money. Shepherd believed that Sclama and Gal instructed the other employee to come into the room to make these comments in his presence, but he pointed to no fact supporting that belief.
Plaintiffs are undoubtedly entitled to having the evidence viewed "in the light most favorable" to them in defending against a motion for summary judgment. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535-36, 666 A.2d 146 (1995). They are not entitled, however, to the benefit of what amounts to no more than supposition, based on no evidence at all.
My colleagues note that in December 1994, Sclama and Gal exchanged Christmas presents "with all other employees on their shift." As I read the record presented to us, however, there were only two other employees on that shift. While excluding plaintiffs from that small circle may have been ill-mannered and narrow, and not in accord with the principles of good management, it cannot be considered the equivalent of isolating plaintiffs from a significantly larger group.
Plaintiffs complain that on several occasions Gal said to them, in effect, "What goes around, comes around." They interpreted these statements as a warning that they would suffer for their support of the positions asserted by Sampson and Greenfield. While such statements might reasonably be interpreted as creating a hostile work environment, according to the record, the latest Gal is alleged to have made such a statement is either in late December 1994 or early January 1995. For the reasons I have earlier set forth, a complaint filed in February 1997 is untimely as to that allegation.
I recognize, as do my colleagues, the demanding nature of the work which plaintiffs performed. Their jobs were difficult in the best of situations and the tensions associated with the Sampson-Greenfield litigation no doubt exacerbated a difficult situation. Sclama and Gal may have reacted in a small and petty manner that made it more difficult for Shepherd and Saylor to do their jobs but I am unable to conclude that the conduct of Sclama and Gal rose to the level of conduct that may be deemed "severe" or "pervasive" for purposes of LAD. Co-workers do not always get along; people do not always react with understanding and tolerance. "An employment discrimination law such as the LAD is not intended to be `a general civility code' for conduct in the workplace.... Discourtesy or rudeness should not be confused with ... harassment." Heitzman v. Monmouth County, 321 N.J.Super. 133, 147, 728 A.2d 297 (App. Div.1999) (citations omitted). The law cannot provide a remedy for all work-related unpleasantness and if it attempts to do so, it will only weaken its ability to provide swift and adequate relief to those truly entitled to its protections.

III
Because I would affirm the trial court's grant of summary judgment for the reasons *240 I have expressed, I do not find it necessary to address the nettlesome question of whether Sclama and Gal can be found individually liable as aiders or abettors. As to this issue, however, see, Newsome v. Administrative Office of the Courts, 103 F.Supp.2d 807, 823 (D.N.J. 2000), noting "the alleged principal wrongdoer... cannot aid and abet his own wrongful conduct."
NOTES
[1] The continuous violation theory is also employed in an evidentiary context, West v. Philadelphia Elec. Co., 45 F.3d 744, 748 (3d Cir. 1995), a case to which my colleagues refer extensively. The present case, of course, does not involve evidentiary rulings.