**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2333-22

GLORIA FLORES,

    Plaintiff-Appellant,

v.

JEANETTE PAGE-HAWKINS,
ROBERT D. JACKSON, ESSEX
COUNTY, ESSEX COUNTY
CITIZEN SERVICES/WELFARE
DEPARTMENT,

    Defendants-Respondents,

and

CHERYL CUCCINELLO,

    Defendant.

_____

Submitted March 20, 2024 – Decided April 30, 2024

Before Judges Currier and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-8167-19.

Cecile D. Portilla, Attorney at Law, LLC, attorneys for appellant (Eldridge T. Hawkins and Cecile Delrose Portilla, on the briefs).

Jerome M. St. John, Essex County Counsel, attorney for respondents (Olivia Palamara, Assistant County Counsel, and DaQuan Edward Brown, Assistant County Counsel, on the brief).

PER CURIAM

Plaintiff Gloria Flores appeals the trial court's March 17, 2023 denial of her motion for reconsideration of the February 7, 2023 order granting summary judgment to defendants Jeanette Page-Hawkins, Robert D. Jackson, Essex County and Essex County Citizen Service/Welfare Department[1] dismissing plaintiff's claims for disability discrimination, hostile work environment, and constructive discharge in connection with her County employment under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50, and denying plaintiff's cross-motion for summary judgment. Because we see no error with the trial court's determination that plaintiff has not established a prima facie case as to any of her LAD-based claims, we affirm.

---

[1] Defendants Jeanette Page-Hawkins, Robert D. Jackson, Essex County and Essex County Citizen Service/Welfare Department are collectively referred to as "defendants." Essex County and the Essex County Citizen Service/Welfare Department are collectively referred to as "the County."

2

I.

In reviewing whether summary judgment was improvidently granted, we view the facts set forth in the record in the light most favorable to non-movants. Harz v. Borough of Spring Lake, 234 N.J. 317, 329 (2018). In doing so, we give non-movants "the benefit of the most favorable evidence and most favorable inferences drawn from that evidence." Gormley v. Wood-El, 218 N.J. 72, 86 (2014); see also R. 4:46-2(c). We summarize the salient facts in the record under this lens.

Plaintiff was hired by the County in May 1990 as a bilingual clerk typist and was promoted to a bilingual secretarial assistant position in 2002, where she remained until 2016. On April 26, 2016, the County eliminated the title of bilingual secretarial assistant and plaintiff was laterally transferred to the title of records support technician 4, with no change in salary.

As required by the State of New Jersey, Civil Service Commission (CSC), plaintiff completed an application for permanent appointment to the records support technician 4 position to effectuate the transfer.

On August 7, 2017, the CSC sent a letter to the County notifying it that plaintiff had failed the qualifying examination for the position due to lack of

experience. The County took no further action in response to the letter and did not notify plaintiff at that time.

On December 10, 2018, plaintiff inquired with the County about possible retirement and to "see what her pension numbers were like." On December 19, 2018, the CSC again sent the County a letter requiring plaintiff's removal from the records support technician 4 position and return to her prior permanent title or another more suitable title. Plaintiff was still not informed at this point about the communication from the CSC.

On January 31, 2019, Page-Hawkins retired, and Kecia Burnett became the new director of the County's Division of Family Assistance & Benefits (DFAB). On February 8, 2019, the CSC sent another letter to the County, this time to Burnett, again reiterating that plaintiff must be removed from the records support technician 4 position.

On February 14, 2019, the County's Records Management Department (RMD) adopted a new case records management (CRM) system to address the over 16,000 cases in backlog. To address the backlog, the RMD increased the number of employees plaintiff supervised from fourteen to twenty-seven on March 18, 2019. Two additional employees, Kareemah Lucas and Valentina

A-2333-22

Green, were assigned to the RMD to serve as consultants in order to facilitate the transition of the CRM system.

On April 1, 2019, Burnett met with plaintiff, who was accompanied by the Public Employee Supervisors' Union (PESU) President Lisa Maddox Douglas. Burnett explained that she "received a memo from human resources stating [plaintiff] did not pass the [qualifying exam] and . . . needed to find her another title maintaining her salary or return her to her last permanent title." During the meeting, Burnett and plaintiff discussed transferring her to another department because "she seemed overwhelmed and over the past few weeks she ha[d] been crying." Plaintiff and Maddox Douglas asked if plaintiff could submit a proposal to correct any deficiencies with her work, to which Burnett agreed. After that date, it was discovered that 21,000 records in the RMD had not had file location updates since February 15, 2019.

On May 17, 2019, Maddox Douglas sent a letter to Burnett stating:

> Our Union submits this Step II Contractual Grievance on behalf of [plaintiff], [r]ecords [s]upport [t]echnician 4 to protest the unfair and disparate manner in which you continuously and unfairly subjected our member. Since your appointment as Division Head [plaintiff] was assigned an unprecedented total of [twenty-seven] clerical employees to report to her. The mere number of employees assigned [to] our member is unconscionable and violates multiple contractual articles. Despite multiple conversations and pleas to

promote an additional Clerk 4 to assist, you rejected such . . . .

.  .  .  .

As remediation our union respectfully demands the following:

.  .  .  .

- Immediately promote an additional Clerk 4 to assist with supervisory roles and responsibilities within the [RMD].

On June 6, 2019, plaintiff sent an email to Inspector General Dominic Scaglione alleging a "[h]ostile [w]ork [e]nvironment."  The email stated,

I am writing to advise that the working environment in which I am subjected to, has jeopardized my safety within the workplace.

I am consistently harassed and intimidated by several employees within my worksite . . . .  The employees in which I would like to identify are Ms. Burnett, Acting Division Head and her direct reports Valentina Green; . . . and Kareemah Lucas, . . . who have consistently utilized intimidation tactics and the like to create an atmosphere which is emotionally hazardous.

The intimidation tactics in which they have engaged include those which have caused emotional consequences as they have consistently engaged in humiliation, intimidation, bullying and angry outbursts in the presence of multiple employees.

I have worked directly with several [d]irectors over my [twenty-nine-]year tenure and never experienced such

6

torturous actions.  As a result, my health is suffering adversely and I have become withdrawn. . . .

On June 17, 2019, Burnett complied with Maddox Douglas' demand and reduced the additional employees that were assigned to plaintiff to ten.

On June 25, 2019, Scaglione and internal investigators Brian Dyer and Casey McMahon interviewed plaintiff regarding her hostile work environment complaint in the presence of Maddox Douglas.  During the interview, plaintiff stated she filed a grievance on April 5, 2019, regarding unfair treatment and retaliatory actions prohibited under the Americans with Disabilities Act (ADA).  However, plaintiff did not provide a copy of the grievance to the investigators, to the trial court or to us on appeal.  Plaintiff stated she believed that Burnett was treating her differently because she went to the County Hall of Records in December 2018 to inquire about retirement.  Plaintiff discussed various incidents where she  felt she was belittled and bullied by Green and Lucas.

Beginning in July of 2019, investigators from the Office of Inspector General conducted interviews with several DFAB employees to investigate plaintiff's harassment complaint including Nancy Gervickas, Brenda Williamson, Janet Bifalco, Green, Lucas, Rosemary Patrick, and Al Fusco.

Plaintiff took a series of leaves of absence beginning July 31, 2019, through January 31, 2020. Plaintiff also submitted documents in furtherance of her retirement. On September 24, 2019, the County's chief financial officer transmitted plaintiff's salary certification to her and confirmed she would be removed from the payroll system as of her chosen retirement date of February 1, 2020.

On October 9, 2019, Scaglione interviewed Burnett regarding plaintiff's workplace harassment complaint. Burnett advised that she was unaware that plaintiff had taken any action to apply for retirement benefits at the time plaintiff filed her harassment complaint. In response to plaintiff's request for additional help in the RMD, Burnett added several clerical workers to assist with the backlog and with the transition of the new CRM system. Those additional workers included Lucas and Green.

Burnett advised Scaglione that plaintiff complained to her directly that she was being "harassed, bullied, and humiliated" by Lucas. Burnett stated she could tell Lucas had issues with plaintiff and instructed Lucas to have no further contact with plaintiff, with any future communication going through Green. Burnett arranged for "communications training" within the agency as a result of the situation between Lucas and plaintiff. Burnett directed plaintiff to contact

her by email instead of coming directly to her office because plaintiff was "constantly changing what she was saying" to her and she "wanted to establish a paper trail."

On September 30, 2019, Burnett learned plaintiff had been admitted to the hospital for an anxiety attack after receiving an email from someone working on the tenth floor at the DFAB office. Burnett did not know who sent the email but stated she did not believe it came from Lucas, as Lucas was assigned to the ninth floor of the office.

On October 28, 2019, following an investigatory interview with Lucas, Scaglione issued a memorandum with his findings. Scaglione determined "there exists sufficient corroboration from the testimony of witnesses to support a finding of conduct unbecoming a [C]ounty employee on the part of . . . Lucas in her interaction with [plaintiff] . . . . Lucas was determined to be rude, dismissive and hostile in her association with [plaintiff]." The findings were "presented to the Director of Department of Citizen Services[] for whatever action [was] deemed appropriate." No other co-worker was found to have acted improperly towards plaintiff.

On November 4, 2019, plaintiff filed a complaint in the Law Division, followed by an amended complaint. On October 6, 2020, plaintiff then filed a

five-count corrected amended complaint alleging: the County violated the LAD by failing to accommodate her under the ADA (count one); breach of contract and breach of implied covenant of good faith and fair dealing, interference with plaintiff's beneficial economic position (count two); misuse and abuse of process (count three); violations of the New Jersey Civil Rights Act under N.J.S.A 10:6-2(c) (count four); and defendants recklessly, intentionally, maliciously, inflicted severe emotional distress on plaintiff with a wanton and reckless disregard to the consequences causing plaintiff to be constructively discharged (count five).

On February 1, 2020, plaintiff retired from employment with the County. There is no evidence in the record that plaintiff submitted any request for a disability accommodation while employed. In her answers to interrogatories, plaintiff identified her disabilities as "anxiety, panic attacks, depression" and "stress."

On February 7, 2023, the trial court granted defendants' motion for summary judgment dismissing plaintiff's corrected amended complaint and denied plaintiff's motion for summary judgment in an order accompanied by a written decision. The trial court rejected plaintiff's argument that defendants' motion was based on an improper certification of counsel that violated Rule 1:6-6. The trial court also rejected plaintiff's argument that summary judgment

could not be granted in favor of defendants because the County did not have publicized policies prohibiting the complained-of conduct, since the County's policy documents were in the summary judgment record.

The trial court also found that the only time plaintiff identified her alleged disabilities was in answers to defendants' interrogatories. The court acknowledged defendants were aware plaintiff was "having some issues with stress or anxiety," but concluded there was nothing in the record establishing plaintiff submitted a clear request for an accommodation of a disability within the standard set forth in Tynan v. Vicinage 13 of the Superior Court of New Jersey, 351 N.J. Super 385, 400 (App. Div. 2002).

Additionally, the trial court found there was no threat of discharge nor was plaintiff ever encouraged to retire early. The trial court noted plaintiff never requested to transfer out of the RMD, and most significantly, plaintiff inquired about retirement on December 10, 2018, prior to the events that she claimed forced her retirement.

Plaintiff filed a motion for reconsideration on February 27, 2023. In the certification in support of the motion for reconsideration, plaintiff's counsel sets forth that the trial judge should recuse herself because of an alleged bias related to a prior unrelated litigation and an alleged improper deficiency notice filed

against plaintiff's counsel. The trial court denied the motion for reconsideration. On the issue of recusal, the trial judge found that plaintiff failed to present any evidence to show impartiality on behalf of the judge against plaintiff. This appeal follows.

II.

On appeal, plaintiff argues the trial court erred in finding that she had not established her LAD claim for failure to accommodate a disability because she did not show proof of a disability or evidence of a clear request to be accommodated for any documented disability. Further, plaintiff asserts the trial court erroneously rejected her hostile work environment and constructive discharge claims.[2] Plaintiff additionally alleges the trial judge hearing the summary judgment motions erred in failing to recuse herself because she gave the appearance of bias and abused her discretion.

We review a trial judge's decision to grant or deny a motion for rehearing or reconsideration under Rule 4:49-2 for an abuse of discretion. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). "'Reconsideration is a matter

---

[2] Plaintiff does not address the dismissal of the claims for breach of contract, breach of the covenant of good faith and fair dealing and abuse of process on appeal. Thus, we do not review the trial court's order granting summary judgment on those causes of action.

within the sound discretion of the [c]ourt, to be exercised in the interest of justice.'" Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996) (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)). Reconsideration is appropriate where "'1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence.'" Ibid. (quoting D'Atria, 242 N.J. Super. at 401-02). Reconsideration is not appropriate where a litigant is unhappy with the trial court's decision and wishes to reargue a motion. Dennehy v. E. Windsor Reg'l Bd. of Educ., 469 N.J. Super. 357, 362-63 (App. Div. 2021) (quoting Palombi v. Palombi, 414 N.J. Super. 274, 288 (App. Div. 2010)), aff'd, 252 N.J. 201 (2022).

We review a grant of summary judgment "de novo, applying the same standard as the trial court." L.A. v. N.J. Div. of Youth & Fam. Servs., 217 N.J. 311, 323 (2014) (citing Coyne v. N.J. Dep't of Transp., 182 N.J. 481, 491 (2005)). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R.

13

4:46-2(c). "To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)).

## III.

At the outset, we address plaintiff's claim that the trial court judge hearing the summary judgment motions should have recused herself from this matter because of her bias towards plaintiff. Specifically, plaintiff contends the judge's bias stems from a prior unrelated case plaintiff's counsel argued before her, and an allegedly improper electronic deficiency notice filed against plaintiff's counsel in separate, unrelated litigation.

Disqualification of a judge is warranted for the reasons specified in Rule 1:12-1, including "when there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." R. 1:12-1(g). To that end, Rule 1:12-2 states that "[a]ny party, on motion made to the judge before trial or argument and stating the reasons therefore, may seek that judge's disqualification." When reviewing the appearance of impropriety, the Court has adopted the test in DeNike v. Cupo, which requires a determination as to whether "a reasonable, fully informed

person [would] have doubts about the judge's impartiality." 196 N.J. 502, 517 (2008).

We find no merit to plaintiff's contention that the judge demonstrated bias against her. Plaintiff did not present any evidence to establish that the allegedly improper deficiency notice posted on eCourts in a previous, unrelated case heard before the judge where one of the parties was represented by plaintiff's counsel, was intentional rather than an error. Plaintiff also failed to present evidence that the judge was impartial in her ruling because of her alleged relation to a former colleague of plaintiff's counsel. Our review of the record confirms the judge hearing the motions did not err in declining to recuse herself on this matter.

We decline to consider plaintiff's newly asserted argument that Rules 1:12-1 and -2 violate the due process rights under the New Jersey and United States Constitutions by allowing the trial judge to rule on her own motion for recusal. Plaintiff did not raise this issue below. "Generally, issues not raised [before the trial court], even constitutional issues, will not ordinarily be considered on appeal unless they are jurisdictional in nature or substantially implicate public interest." Paff v. Ocean Cnty. Prosecutor's Off., 446 N.J. Super. 163, 190 (App. Div. 2016) (alteration in original) (quoting State v. Walker, 385 N.J. Super. 388, 410 (App. Div. 2006)), rev'd on other grounds, 235 N.J.1

(2018). Plaintiff's argument does not meet this heightened standard. Therefore, no further discussion is warranted on this issue.

IV.

Next, we turn to our review of the trial court's grant of summary judgment as to plaintiff's failure to accommodate, hostile work environment, and constructive discharge claims under the LAD. Under the LAD, an employee who has a disability is a member of a protected class. N.J.S.A. 10:5-12. Disability is defined under N.J.S.A. 10:5-5(q).

> Pursuant to N.J.S.A. 10:5-5(q), there are two specific categories of handicap: physical and non-physical. The physical and non-physical clauses of the statute are distinct from each other and provide separate ways of proving handicap.
>
> To meet the physical standard, a plaintiff must prove that he or she is (1) suffering from physical disability, infirmity, malformation or disfigurement (2) which is caused by bodily injury, birth defect or illness including epilepsy. . . . To meet the non-physical standard, a plaintiff must prove that he or she is suffering (1) from any mental, psychological or developmental disability (2) resulting from an anatomical, psychological, physiological or neurological condition that either (a) prevents the normal exercise of any bodily or mental functions or (b) is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.
>
> . . . .

> Where the existence of a handicap is not readily apparent, expert medical evidence is required. Accordingly, courts place a high premium on the use and strength of objective medical testimony in proving the specific elements of each test contained in the statute.
>
> [Viscik v. Fowler Equip. Co., 173 N.J. 1, 15-16 (2002) (italicization omitted) (citations omitted).]

"Discrimination based on an employee's disability, or perceived disability, is illegal under the LAD." Guzman v. M. Teixeira Int'l, Inc., 476 N.J. Super. 64, 70 (App. Div. 2023).

We broadly construe and apply the protections of the LAD to allow for the greatest available antidiscrimination impact. Richter v. Oakland Bd. of Educ., 246 N.J. 507, 537 (2021). "The LAD's worthy purpose is no less than eradication of '"the cancer of discrimination" in our society.'" Ibid. (quoting Smith v. Millville Rescue Squad, 225 N.J. 373, 390 (2016) (quoting Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 115 (2010))). In a discrimination claim under the LAD, it is the plaintiff who bears the burden to establish a prima facie case. Victor v. State, 203 N.J. 383, 408 (2010).

Given that claims under the LAD are to be interpreted broadly and the standard for summary judgment requires facts to be viewed in the light most favorable to the non-moving party, the trial court's task is not to determine the

strength of the case, but rather if plaintiff's "allegations, if true, can establish that defendant[] violated the LAD." Beneduci v. Graham Curtin, P.A., 476 N.J. Super. 73, 81-82 (App. Div. 2023).

> Rather than considering each incident in isolation, courts must consider the cumulative effect of the various incidents, bearing in mind "that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes."
>
> [Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 607 (1993) (quoting Burns v. McGregor Elec. Indus., Inc., 955 F.2d 559, 564 (8th Cir. 1992)). ]

## A. Failure to accommodate under the LAD.

Under the LAD, a plaintiff has a cause of action for failure to accommodate a disability when they prove that: (1) they qualify as having a disability or perceived disability, (2) they were performing the functions of their job, and (3) defendant failed to accommodate plaintiff's disability. Victor, 203 N.J. at 410. "It is not necessary that requests for reasonable accommodations be in writing or even use the phrase 'reasonable accommodation.'" Tynan, 351 N.J. Super. at 400 (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999)). "While there are no magic words to seek an accommodation, the employee, however, '"must make clear that . . . assistance [is desired] for his or

her disability."'" Ibid. (quoting Jones v. United Parcel Serv., 214 F.3d 402, 408 (3d. Cir. 2000)). "An employee may use plain English and need not mention the ADA or any other legal source requiring accommodation." Ibid. (citing Taylor, 184 F.3d at 313). Tynan sets forth the following four-part test that an employee must establish in order to prevail on a failure to accommodate claim:

> (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.
>
> [Id. at 400-01.]

Plaintiff argues that she established a prima facie case of discrimination for failure to accommodate under the LAD by making the County aware of her disability through medical information transmitted during the course of her employment. We are unconvinced that plaintiff has met the Tynan standard.

The trial court did not err in finding that plaintiff did not submit any request for accommodation of a disability to her employer. Even if plaintiff mentioned in an email her health was "suffering," there is no evidence in the record she made any request for a disability accommodation. Any request for

leaves of absences that plaintiff submitted were granted. Therefore, we conclude the trial court did not err in finding the plaintiff did not establish a prima facie case of failure to accommodate a disability under LAD.

## B. Hostile work environment under the LAD.

To establish a hostile work environment under LAD, plaintiff must prove "(1) that plaintiff is in a protected class; (2) that plaintiff was subjected to conduct that would not have occurred but for that protected status; and (3) that it was severe or pervasive enough to alter the conditions of employment." Victor, 203 N.J. at 409 (citing Lehmann, 132 N.J. at 603-04).

Plaintiff argues that Scaglione's report affirms her claim of a hostile work environment. Scaglione found that Lucas was "rude, dismissive, and hostile in her association with [plaintiff.]" Plaintiff alleges the hostility was related to plaintiff's disability because Burnett wanted to transfer her since she was "overwhelmed and . . . crying" all the time.

The trial court found that even assuming plaintiff's anxiety was a LAD-protected disability, she did not establish that the conduct would not have occurred but for any medically-established disability. The trial court found that plaintiff supported her claim using the effects it had on her, rather than the conduct itself, which is insufficient under Lehmann. The trial court found that

plaintiff was unable to connect the conduct of Lucas to her protected status nor that the conduct was severe enough to alter the conditions of plaintiff's employment.

We find no error in the trial court's ruling. There are no proofs in the record establishing that any conduct was taken because of any alleged disability. While Scaglione's investigative report found plaintiff was subject to rude and dismissive behavior from Lucas, there was no evidence proffered Lucas' conduct was undertaken because of plaintiff's disability and the conduct was not pervasive or severe enough to alter the conditions of plaintiff's employment.

### C. Constructive discharge under the LAD.

"[C]onstructive discharge under the LAD occurs when an '"employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."'" Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 27 (2002) (alteration in original) (quoting Muench v. Twp. of Haddon, 255 N.J. Super. 288, 302 (App. Div. 1992)). Constructive discharge requires more than the severe or pervasive conduct required to establish a hostile work environment. Ibid. "[T]he standard envisions a 'sense of outrageous, coercive and unconscionable requirements.'" Id. at 28 (quoting Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 428 (App. Div. 2001)).

A constructive discharge analysis requires the court to "consider 'the nature of the harassment, the closeness of the working relationship between the harasser and the victim, whether the employee resorted to internal grievance procedures, the responsiveness of the employer to the employee's complaints, and all other relevant circumstances." Ibid. (quoting Shepherd v. Hunterdon Dev. Ctr., 336 N.J. Super. 395, 420 (App. Div. 2001)). "'[A]n employee has the obligation to do what is necessary and reasonable in order to remain employed rather than simply quit.'" Ibid. (quoting Shepherd, 336 N.J. Super. at 420).

Plaintiff claims that when Burnett became the new division head in 2019, she sought to demote plaintiff because she had animus towards her, which ultimately led plaintiff to retire early. Plaintiff also claims that her failure to qualify for the records management title was a pretext for discrimination against her evidenced by Burnett recommending her demotion and transfer to another floor.

The undisputed facts in the record establish plaintiff complained directly to Burnett that she felt she was being harassed, bullied, and humiliated by Lucas. Burnett met with Lucas and advised her that she was to not have any contact with plaintiff. Burnett also arranged communications training following plaintiff's complaint.

The trial court did not err in concluding that plaintiff did not establish a prima facie case of constructive discharge under the LAD. Plaintiff provides no evidence that any of Burnett's actions were taken because of an alleged disability. The undisputed facts in the record establish the CSC directed Burnett to move plaintiff to a title she was qualified for. When given the opportunity to fill a position she was qualified for, plaintiff asked Burnett if she could remain in the RMD. The undisputed facts establish Burnett acted appropriately in responding to plaintiff's complaint.

Plaintiff also inquired about retirement prior to the events that led to her complaint. A claim of constructive discharge fails where evidence shows that plaintiff had contemplated retirement prior to the events that allegedly forced retirement. See Kirschling v. Atl. City Bd. of Educ., 10 F.Supp.3d 587, 601 (D.N.J. 2014). In reviewing all of the relevant circumstances, we are unconvinced that plaintiff established a prima facie case of constructive discharge.

V.

Plaintiff proffers a multitude of other arguments regarding the inadequacy of defendants' proofs on summary judgment, which the trial court rejected. We are unconvinced the trial court erred and conclude that defendants submitted

23

appropriate proofs which were considered as part of the summary judgment record.  We briefly address plaintiff's contentions.

Plaintiff posited that defendants have not produced any facts or affidavits based on personal knowledge pursuant to Rule 1:6-6 in support of summary judgment; defendants improperly cite to plaintiff's complaint for their statement of material facts; defendants' affidavit was signed by their lawyer in violation of Murray v. Allstate Ins. Co., 209 N.J. Super. 163 (App. Div. 1986), appeal dismissed, 110 N.J. 293 (1988); and alleged unauthenticated documents produced by defendants are inadmissible under N.J.R.E. 803(b)(4) and should not have been considered as part of the record on summary judgment.

The trial court did not err in concluding Murray does not require the court to disregard the documents identified by defendants' counsel in their certification because there are no facts set forth characterizing them or interpreting them.  We also conclude Rule 803(b)(4) was also not violated since plaintiff has presented no legal authority supporting the argument that defendants are barred from introducing the alleged unauthenticated documents, while plaintiff simultaneously relies on them for its position on summary judgment.

A-2333-22

## VI.

We decline to further consider plaintiff's argument that the trial court did not comply with Rule 1:7-4 by failing to provide a statement of reasons for the entry of the summary judgment orders because this assertion is belied by the extensive written decision issued by the trial court on summary judgment and the oral statement of reasons supporting the denial of reconsideration.

To the extent we have not addressed any arguments raised by plaintiff, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2333-22